In the United States Court of Appeals
for the Tenth Circuit

CASE NO. 25-1243

GREENLATINOS, 350 COLORADO,
AND SIERRA CLUB,

    *Plaintiff – Appellant,*

    v.

SUNCOR ENERGY (U.S.A.), INC.,

    *Defendant – Appellee.*

On Appeal from the United Stated District Court
For the District of Colorado
The Honorable Judge Domenico
D.C. No. 1:24-cv-02164-DDD

**CORRECTED Appellants' Opening Brief**

November 4, 2025

Ian Coghill
Rachael Jaffe
EARTHJUSTICE
1125 17th Street
Suite 1010
Denver, CO 80202
303-996-4620
303-996-9613
icoghill@earthjustice.org
rjaffe@earthjustice.org

*Counsel for GreenLatinos, 350
Colorado, and Sierra Club*

**Oral Argument Requested**

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................ii

TABLE OF AUTHORITIES .......................................................................... iv

STATEMENT OF RELATED APPEALS ................................................... ix

GLOSSARY ..................................................................................................... iv

INTRODUCTION ............................................................................................ 1

STATEMENT OF JURISDICTION............................................................ 4

STATEMENT OF THE ISSUES .................................................................. 5

STATEMENT OF THE CASE ...................................................................... 6

    I.   Statutory and Regulatory Background ................................................... 6

    II.  Factual Background & Procedural History ......................................... 12

        A.  Suncor's Commerce City Refinery ............................................... 12

        B.  Suncor's past violations and related consent decrees and
            administrative enforcement actions .............................................. 15

        C.  Suncor's present-day violations and the harm they cause to
            GreenLatinos ................................................................................ 17

        D.  The District Court's dismissal of GreenLatinos' suit on diligent
            prosecution grounds ...................................................................... 20

SUMMARY OF THE ARGUMENT.......................................................... 22

STANDARD OF REVIEW .......................................................................... 23

ARGUMENT ................................................................................................. 24

    I.   The Diligent Prosecution Bar Does Not Apply to Any of
       GreenLatinos' Claims Because No Government "Is Prosecuting A
       Civil Action In A Court".................................................................... 24

# TABLE OF CONTENTS—CONTINUED

<u>Page</u>

    A. Consent decrees are final judgments, not "a civil action in a court" that the government "is ... prosecuting" ............................ 25

    B. An administrative enforcement action is not "a civil action in a court" ..................................................................................... 28

    C. The District Court's policy concerns cannot override the plain text and are also misplaced .................................................. 34

II. The Diligent Prosecution Bar Does Not Apply Because GreenLatinos' Claims Do Not Allege Violations of the Same "Emission Standards or Limitations" As the Consent Decrees ............ 36

    A. Mere *similarity* of standards impermissibly weakens the Act's requirement, which refers to "*the* standard" ................................... 37

    B. None of GreenLatinos' claims seek to require compliance with the same standards as the decrees. ................................................. 39

        1. RACT Standards (Claims 4, 15, 20, and 22) ............................ 39

        2. MACT Standards (Claims 6, 9, 12, 18, 21, 23, 27, and 28) ....... 41

        3. NSPS Subpart Ja (Claims 2 and 11) ......................................... 42

        4. SIP Provisions (Claims 7, 8, and 24) ....................................... 42

        5. Permit Violations (Claims 3 and 19)......................................... 43

        6. NSPS Subpart J (Claims 1, 5, 10, and 17)................................ 44

        7. Consent Decree Limits (Claims 13, 14, 16, and 25).................. 46

III. The Diligent Prosecution Bar Does Not Apply because Any Government Prosecution was Not "Diligent" ..................................... 47

    A. GreenLatinos adequately alleged that any prosecution of the standards in its claims was not diligent ......................................... 49

## TABLE OF CONTENTS—CONTINUED

Page

B.  The district court erred in holding that the administrative actions qualified as diligent prosecution ..................................................... 52

1.  The evidence cited by the District Court does not support its finding of diligence.................................................................. 52

2.  The District Court applied the wrong standard to GreenLatinos' claims on the motion to dismiss ....................... 56

CONCLUSION.......................................................................................... 58

ORAL ARGUMENT STATEMENT ........................................................ 60

CERTIFICATE OF COMPLIANCE......................................................... 61

## ATTACHMENTS

Dkt. 47, USDC CO, 1:24-cv-2164

Ordering Granting Motion to Dismiss .............................. Attachment 1

Dkt. 48, USDC CO, 1:24-cv-2164

Final Judgment................................................................... Attachment 2

42 U.S.C. § 7604, Citizen Suits .................................................. Attachment 3

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Berry v. Farmland Indus., Inc.*,
 114 F. Supp. 2d 1150 (D. Kan. 2000).......................................................... 38

*Bostock v. Clayton Cnty.*,
 590 U.S. 644 (2020) ............................................................................26, 30

*California Sportfishing Prot. Alliance v. Chico Scrap Metal, Inc.*,
 728 F.3d 868 (9th Cir. 2013) .................................................................... 37

*Cebollero-Bertran v. Puerto Rico Aqueduct & Sewer Auth.*,
 4 F.4th 63 (1st Cir. 2021) ........................................................................49, 50

*Chico Serv. Station, Inc. v. Sol Puerto Rico Ltd.*,
 633 F.3d 20 (1st Cir. 2011) ...................................................................... 34

*Citizens for a Better Env't-California v. Union Oil Co.*,
 83 F.3d 1111 (9th Cir. 1996) .................................................................... 26

*City of Fairborn v. U.S. Env't Prot. Agency*,
 No. 3:22-CV-102, 2024 WL 555929 (S.D. Ohio Feb. 12, 2024)
 (unpublished) ........................................................................................ 47

*Conn. Fund for Env't v. Contract Plating Co.*,
 631 F. Supp. 1291 (D. Conn. 1986) .......................................................... 56

*Consumers Gas & Oil, Inc. v. Farmland Indus., Inc.*,
 84 F.3d 367 (10th Cir. 1996) .................................................................... 51

*Dodge v. Mirant Mid-Atlantic, LLC*,
 732 F. Supp. 2d 578 (D. Md. 2010) .......................................................... 50

*Espinosa v. Roswell Tower, Inc.*,
 32 F.3d 491 (10th Cir. 1994) .................................................................... 10

*Friends of the Earth v. Consolidated Rail Corp.*,
 768 F.2d 57 (2d Cir. 1985) ........................................................................ 29

# TABLE OF AUTHORITIES—CONTINUED

Page(s)

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
    528 U.S. 167 (2000) ...................................................... 10-11, 52

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
    890 F. Supp. 470 (D.S.C. 1995) ........................................ 54, 56

*Friends of Milwaukee's Rivers v. Milwaukee Metro. Sewerage Dist.*,
    382 F.3d 743 (7th Cir. 2004) ................................. 32, 36, 48, 49, 50, 57, 58

*Frilling v. Vill. of Anna*,
    924 F. Supp. 821 (S.D. Ohio 1996) .......................................... 38

*Glazer v. Am. Ecology Env't Servs. Corp.*,
    894 F. Supp. 1029 (E.D. Tex. 1995) ........................................ 38

*Grp. Against Smog and Pollution, Inc. v. Shenango, Inc.*,
    810 F.3d 116 (3rd Cir. 2016) ............................................. 33, 51

*Hallstrom v. Tillamook Cnty.*,
    493 U.S. 20 (1989) .......................................................... 11

*Jackson v. Los Lunas Cmty. Program*,
    880 F.3d 1176 (10th Cir. 2018) .............................................. 25

*Johnson v. Smith*,
    104 F.4th 153 (10th Cir. 2024) .............................................. 24

*Jones v. City of Lakeland*,
    224 F.3d 518 (6th Cir. 2000) (en banc) ................................. 29, 55, 56

*Karr v. Hefner*,
    475 F.3d 1192 (10th Cir. 2007) ............................... 27, 32, 33, 49, 56, 57

*Kentucky Waterways All. v. Kentucky Utils. Co.*,
    905 F.3d 925 (6th Cir. 2018) ................................................ 34

*Knee Deep Cattle Co. v. Bindana Inv. Co.*,
    94 F.3d 514 (9th Cir. 1996) ................................................. 27

# TABLE OF AUTHORITIES—CONTINUED

<u>Page(s)</u>

*Lackey v. Stinnie*,
　145 S. Ct. 659 (2025) ................................................................. 51

*McAbee v. City of Fort Payne*,
　318 F.3d 1248 (11th Cir. 2003).................................................. 31

*Naturaland Tr. v. Dakota Fin. LLC*,
　41 F.4th 342 (4th Cir. 2022) ......................................... 31-32, 53

*Ohio Valley Env't Coal. v. Bluestone Coal Corp.*,
　No. CV 1:19-00576, 2020 WL 2949782 (S.D. W. Va. June 3,
　2020) (unpublished) .................................................................... 49

*Ohio Valley Env't Coalition, Inc. v. Hobet Min., LLC*,
　723 F. Supp. 2d 886 (S.D.W. Va. 2010) .................................... 48

*Ortiz Osorio v. Municipality of Loiza*,
　39 F. Supp. 3d 159 (D.P.R. 2014)............................................... 55

*Paper, Allied-Indus., Chem. And Energy Workers Int'l Union v. Cont'l
　Carbon Co.*,
　428 F.3d 1285 (10th Cir. 2005)............................................29, 31

*Piney Run Pres. Ass'n v. Cnty. Comm'r of Carrol Cnty.*,
　523 F.3d 45 (4th Cir. 2008) ................................................50, 57

*Pub. Int. Rsch. Grp. of New Jersey, Inc. v. GAF Corp.*,
　770 F. Supp. 943 (D.N.J. 1991)............................................25, 27

*S. River Watershed All., Inc. v. Dekalb Cnty., Georgia*,
　484 F. Supp. 3d 1353 (N.D. Ga. 2020) ...................................... 48

*S. River Watershed All., Inc. v. Dekalb Cnty., Georgia*,
　69 F.4th 809 (11th Cir. 2023) ...........................................27, 50, 51, 57

*Sierra Club v. Chevron U.S.A., Inc.*,
　834 F.2d 1517 (9th Cir. 1987)................................................... 29

## TABLE OF AUTHORITIES—CONTINUED

Page(s)

*Sierra Club v. City and Cnty. of Honolulu*,
  No. 04-00463, 2008 WL 1968317 (D. Haw. May 7, 2008)
  (unpublished) ................................................................ 51

*Sierra Club v. Two Elk Generation Partners, Ltd. P'ship*,
  646 F.3d 1258 (10th Cir. 2011) .................................. 25, 35, 57

*St. Bernard Citizens for Env't Quality, Inc. v. Chalmette Refining, LLC*,
  500 F. Supp. 2d 592 (E.D. La. 2007) ............................... 48

*Texans United for a Safe Econ. Educ. Fund v. Crown Cent. Petroleum Corp.*,
  207 F.3d 789 (5th Cir. 2000) ........................................ 29

*Utah Physicians for a Healthy Env't v. Diesel Power Gear, LLC*,
  21 F.4th 1229 (10th Cir. 2021) .................................. 9, 10, 11

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*,
  894 F.3d 1030 (9th Cir. 2018) ....................................... 38

*Washington Pub. Int. Rsch. Grp. (Wash PIRG) v. Pendleton Woolen Mills*,
  11 F.3d 883 (9th Cir. 1993) ........................................ 30, 34

*Wildearth Guardians v. Lamar Utilities Bd.*,
  No. 11-CV-00742-MSK-MJW, 2012 WL 1059981 (D. Colo. Mar. 29, 2012) (unpublished) ............................... 28, 49

**Statutes**

C.R.S. § 25-7-115 ............................................... 10, 31, 53

28 U.S.C. § 1291 ..................................................... 5

28 U.S.C § 1331 ...................................................... 4

33 U.S.C. § 1319 .............................................. 26, 29, 31

# TABLE OF AUTHORITIES—CONTINUED

<u>Page(s)</u>

33 U.S.C. § 1365 ........................................................................ 29

42 U.S.C. § 6972 ....................................................... 26, 30, 32

42 U.S.C. § 7401 .......................................................................... 6

42 U.S.C. § 7409 .......................................................................... 7

42 U.S.C. § 7410 ....................................................................7, 10

42 U.S.C. § 7411 ........................................................................ 10

42 U.S.C. § 7412 .....................................................................8, 10

42 U.S.C. § 7413 .....................................9, 11, 31, 35, 53, 54

42 U.S.C. § 7502 .......................................................................... 7

42 U.S.C. § 7604 ....................................1, 4, 11, 20, 22-25, 28, 30, 35-37, 39

42 U.S.C. § 9659 ........................................................................ 30

42 U.S.C. § 11046 ...................................................................... 30

**Other Authorities**

40 C.F.R. § 19.4 .....................................................................9, 54

40 C.F.R. § 22.13 ...................................................................9, 32

40 C.F.R. § 22.34 ........................................................................ 9

40 C.F.R. § 51.160 ...................................................................... 7

40 C.F.R. §§ 60.1-60.19 .......................................................... 46

40 C.F.R. § 60.18 ...................................................................... 43

40 C.F.R. § 60.100 .................................................................7, 45

40 C.F.R. § 60.100a ...............................................................7, 42

## TABLE OF AUTHORITIES—CONTINUED

Page(s)

40 C.F.R. § 60.102 ................................................................ 43

40 C.F.R. §§ 60.105-08 ......................................................... 7

40 C.F.R. § 63.51 ................................................................. 8

40 C.F.R. § 63.1563 ............................................................ 41

40 C.F.R. § 63.1564 ............................................................ 41

40 C.F.R. § 70.6 ................................................................... 8

73 Fed. Reg. 35838 (June 24, 2008)....................................... 42

80 Fed. Reg. 75178 (Dec. 1, 2015) .....................................8, 41

Federal Rule of Civil Procedure 12(b)(6) ...........................21, 23

H.R. 17255, 116 Cong. Rec. 42,387 (1970) (Conf. Rep.) (statement
of Sen. Muskie) ................................................................ 12

Jeffrey G. Miller, *Theme and Variations in Statutory Preclusions
Against Successive Environmental Enforcement Actions by EPA and
Citizens Part One: Statutory Bars in Citizen Suit Provisions*,
28 Harv. Env't. L. Rev. 401, 463 (2004)................................ 48

## STATEMENT OF RELATED APPEALS

Under Circuit Rule 28.2(C)(1), there are no prior or related appeals.

ix

# GLOSSARY

| Abbreviation | Term |
| --- | --- |
| APCD | Air Pollution Control Division of the Colorado Department of Public Health |
| CERCLA | Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq. |
| FCCU | Fluid catalytic cracking unit |
| MACT | Maximum Available Control Technology |
| MACT CC | National Emission Standards for Hazardous Air Pollutants From Petroleum Refineries, 40 C.F.R. Part 63 Subpart CC |
| MACT UUU | National Emission Standards for Hazardous Air Pollutants for Petroleum Refineries: Catalytic Cracking Units, Catalytic Reforming Units, and Sulfur Recovery Units, 40 C.F.R. Part 63 Subpart UUU |
| NAAQS | National Ambient Air Quality Standards |
| NESHAP | National Emissions Standards for Hazardous Air Pollutants |
| NSPS | New Source Performance Standards |
| NSPS Subpart J | Standards of Performance for Petroleum Refineries, 40 C.F.R. Part 60 Subpart J |

iv

| Abbreviation | Term |
| --- | --- |
| NSPS Subpart Ja . | Standards of Performance for Petroleum Refineries for Which Construction, Reconstruction, or Modification Commenced After May 14, 2007, 40 C.F.R. Part 60 Subpart Ja |
| RACT................. | Reasonably Available Control Technology |
| RCRA................. | Resource Conservation and Recovery Act |
| SIP..................... | State Implementation Plan |
| SRU.................... | Sulfur recovery unit |

## INTRODUCTION

In this case, Plaintiff-Appellants GreenLatinos, 350 Colorado, and Sierra Club ("GreenLatinos") brought a textbook Clean Air Act citizen suit to protect themselves from repeated and ongoing violations by the Suncor refinery that have spread harmful air pollutants like sulfur dioxide, benzene, and cadmium into the surrounding neighborhoods in Commerce City and Denver, Colorado. Based on Suncor's own emission exceedance and permit deviation reporting to regulators, GreenLatinos brought twenty-eight claims for violations of thirty emission standards,[1] covering more than twenty pollutants, at more than forty sources within the refinery.

The citizen suit provision establishes a straightforward framework for those harmed by a facility's pollution to participate in enforcing the Clean Air Act. Anyone who is harmed by a polluter's violations of an emission standard can sue in federal court to stop the violations and deter future ones. There is one primary limitation to this option: A plaintiff cannot file a separate complaint if EPA or a State is already prosecuting the same emission standard violation in federal or state court, and the agency is prosecuting the case

---

[1] In this brief, "emission standard" or "standard" refers to "emission standard or limitation under this chapter," as defined at 42 U.S.C. § 7604(f); *see also id.* § 7604(a)(1).

1

"diligently." By its terms, the diligent prosecution bar does not apply to GreenLatinos' claims because no agency was prosecuting any action in court when GreenLatinos filed the complaint, let alone diligently prosecuting an action for the same emission standard violations that GreenLatinos allege.

In reaching a different result, the District Court effectively grafted a new exception onto the Clean Air Act that would bar citizen suits against any source subject to a consent decree—regardless of the age of the decree, whether the decree enforced the same emission standards as the citizen suit, or whether the decree actually achieved compliance with the Act.

*First*, the court stretched the "prosecuting ... in a court" requirement well beyond the statutory text. It bundled together twenty-year-old consent decrees with out-of-court *administrative* settlements and notice letters and held that they met the "prosecuting … in a court" requirement—even though no government agency has, in fact, prosecuted them in court. In so doing, the court ignored both the present tense of "prosecuting" and Congress' decision to exclude administrative enforcement from the diligent prosecution bar.

*Second*, the court found that GreenLatinos' claims sought to enforce the same or similar emission standards as the twenty-year-old consent decrees and were barred as a result. But in doing so, the District Court failed to actually match the specific standards GreenLatinos allege were violated to the

2

standards enforced in the decrees, resulting in a holding that plainly conflicts with the facts underlying the decrees themselves. Most of GreenLatinos' claims allege violations of emissions standards that were adopted *after* the consent decrees were entered, so those standards were clearly not enforced by the decrees. Many of GreenLatinos' claims involve standards that are not mentioned in the decrees. And several enforce standards for pollutants not covered by the decrees.

*Finally*, even assuming that the first two elements of the diligent prosecution bar were met, the District Court ignored GreenLatinos' allegations showing that any prosecution fails the diligence test. Suncor's violations have continued for years and represent an ongoing, unabated threat to surrounding communities. The State's two out-of-court administrative settlement orders have not brought Suncor into compliance with the Act, and neither the State nor EPA have sought court intervention to enforce the consent decrees. Viewed in the light most favorable to GreenLatinos, these facts establish a lack of diligence sufficient to survive a motion to dismiss.

The decision below upends Congress' careful balancing of the interests of agencies and the affected public in both enforcing the Act's pollution limits and avoiding duplicative court actions. To achieve that balance, Congress authorized the government to bring administrative or judicial enforcement

against polluters, while also authorizing those harmed by pollution to protect themselves by filing their own judicial enforcement action after giving notice to the government. The government can take the lead and ensure a citizen suit cannot be filed by (1) filing its own judicial—not administrative—enforcement action before a citizen suit, and (2) continuing to diligently prosecute that case in court. For years, the government has failed to do so, instead choosing to enter administrative settlements that have not abated the violations. As a result, the statute empowers GreenLatinos to sue to stop the illegal pollution harming its members.

Because the District Court's dismissal of GreenLatinos' claims improperly expanded the diligent prosecution bar well beyond the limits set by the plain statutory text, this court should reverse and remand the decision and direct the District Court to enter an order denying the motion to dismiss.

## STATEMENT OF JURISDICTION

The District Court entered a final judgment in this action, over which it had jurisdiction under 28 U.S.C. § 1331 and 42 U.S.C. § 7604(a), on May 23,

2025. App. Vol. X at 2315.[2] GreenLatinos timely appealed on June 23, 2025.

This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether the District Court erred in holding that the diligent

prosecution bar, requiring that the government be "prosecuting a civil action in

a court," can be met by out-of-court administrative enforcement of twenty-

year-old consent decrees, even though Congress expressly excluded

administrative enforcement actions from triggering the exception?

2. Whether the District Court erred in holding that GreenLatinos' claims

sought to enforce "identical or substantially similar" violations as the twenty-

year-old consent decrees, even though: (1) the diligent prosecution bar only

applies to enforcement of identical standards, and (2) the standards alleged in

the amended complaint were not, and could not have been, the subject of the

decrees?

3. Whether the District Court erred in finding that administrative

enforcement of consent decrees was *diligent* prosecution despite GreenLatinos'

allegations that (1) Suncor has continued to violate its emission limits and

_____

[2] This brief cites to the Appendix by volume and page number, as follows:
"App. Vol. [Roman numeral] at [page number]." Appendix page numbers are
consecutive across volumes.

expose nearby communities to pollutants despite the administrative enforcement, (2) the consent decrees are twenty years old and all substantive work has been completed, and (3) no agency has filed an action in court to enforce Suncor's compliance with the Act or the decrees in the twenty years since the decrees were entered?

## STATEMENT OF THE CASE

### I.    Statutory and Regulatory Background

The Clean Air Act exists "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1). To meet this goal, generally the Act directs the federal government to set air pollution standards to protect public health and directs states to generate State Implementation Plans, or SIPs, to implement those standards through specific permit limits and standards.

Two types of federal air pollution standards are relevant here.

The first are standards governing so-called criteria air pollutants, which include sulfur dioxide, particulate matter, carbon monoxide, ozone, and nitrogen oxides. The Act requires EPA to establish National Ambient Air Quality Standards, or NAAQS, for criteria pollutants, which set standards for these pollutants at levels that protect public health and welfare. *See id.*

6

§ 7409(a)-(b). It then requires states to adopt SIPs "for implementation, maintenance, and enforcement" of those standards. *Id.* § 7410(a), (k).

To meet the NAAQS, the Act uses different strategies for different kinds of sources. EPA adopts New Source Performance Standards ("NSPS") for certain categories of industrial facilities or process units constructed or modified after the relevant standard is promulgated. *See id.* § 7411. These NSPS impose uniform technology-based emission limits, *see id.*, as well as emission monitoring, testing, reporting, and recordkeeping requirements, *see, e.g.,* 40 C.F.R. §§ 60.105-08. For example, as relevant here, fuel gas combustion devices (i.e., boilers and process heaters) at petroleum refineries must meet a certain set of NSPS (known as Subpart J) if constructed or modified between June 11, 1973 and May 14, 2007, but they must meet a different set (known as Subpart Ja) if constructed or modified later. *See* 40 C.F.R. § 60.100(b), *id.* § 60.100a(b). Separate provisions of the Act require that the relevant state SIP include reasonably available control technology ("RACT") requirements to control criteria pollutants. *See* 42 U.S.C. § 7502(c)(1). States generally impose NSPS and SIP requirements on sources in pre-construction permits required under the Act's New Source Review program. *See, e.g.,* 42 U.S.C. § 7410(a)(2)(C); 40 C.F.R. § 51.160. These

7

requirements are then incorporated into operating permits issued by the state under Title V of the Act, referred to as Title V permits. *See* 40 C.F.R. § 70.6(a).

The second set of relevant air pollution standards are for hazardous air pollutants such as benzene, formaldehyde, and particulate metals like arsenic and lead that can cause cancer or other serious health effects. 42 U.S.C. § 7412; *see generally* 80 Fed. Reg. 75178 (Dec. 1, 2015) (revising standards for petroleum refineries). The Act directs the EPA to set National Emissions Standards for Hazardous Air Pollutants, known as NESHAPs. 42 U.S.C. § 7412. Under that program, EPA establishes technology-based emission standards that "require the maximum degree of reduction in emissions" that EPA determines are achievable for a particular category of sources. *Id.* § 7412(d)(2). These standards are referred to as Maximum Available Control Technology ("MACT"). *See* 40 C.F.R. § 63.51. For example, one set of standards governs emissions of organic and metallic hazardous air pollutant emissions from fluid catalytic cracking units and sulfur recovery units at petroleum refineries. MACT UUU, *id.* §§ 63.1560-63.1579. While another governs emissions of more than twenty hazardous air pollutants from other pollution sources at those refineries, including flares. MACT CC, *id.* §§ 63.640-63.671.

When polluting sources fail to meet these emission standards, the Act gives EPA and State regulators a primary enforcement role while also giving the people harmed by unlawful pollution a complimentary enforcement role. *Utah Physicians for a Healthy Env't v. Diesel Power Gear, LLC*, 21 F.4th 1229, 1243 (10th Cir. 2021).

The Act authorizes EPA to act through both administrative and judicial proceedings. *See* 42 U.S.C. § 7413(a)(1) (authorizing EPA to issue a compliance order, "an administrative penalty," or "bring a civil action"); *id.* § 7413(a)(3) (similar). In a civil action, EPA can obtain equitable relief and civil penalties of approximately $125,000 per day per violation. 42 U.S.C. § 7413(b), 40 C.F.R. § 19.4 (adjusting maximum per day penalty for inflation). EPA's administrative enforcement authority is more limited. Penalty orders are limited to violations occurring within the preceding year and are capped at less than $500,000 total. *See* 42 U.S.C. § 7413(d)(1), 40 C.F.R. § 19.4 (adjusting maximum total administrative penalty for inflation). EPA is required to take certain preliminary steps before initiating enforcement. It sends a notice of violation before initiating certain judicial enforcement or issuing any administrative penalty. 42 U.S.C. § 7413(a)(1), (d)(2)(A). It must also file a formal administrative complaint before issuing an administrative penalty order. 40 C.F.R. §§ 22.13, 22.34.

The Act also authorizes states to enforce violations of its SIP and federal standards if EPA has approved the state's program. *See* 42 U.S.C. §§ 7410(a)(2)(C), 7411(c), 7412(l). However, states are "confined to seeking only state-law remedies for violation[s]." *Utah Physicians*, 21 F.4th at 1238; *see also Espinosa v. Roswell Tower, Inc.*, 32 F.3d 491, 492 (10th Cir. 1994). In Colorado, administrative proceedings follow certain steps. The Air Pollution Control Division ("APCD") of the Colorado Department of Public Health and Environment "issues a Compliance Advisory" or "Notice of Violation" to "notify a Source of alleged violations or noncompliance."[3] These notices are part of the state's investigation, and the state does not make a violation determination until it issues an order C.R.S. § 25-7-115(2)(c)(II), (3). If APCD determines that violations have occurred, it issues an administrative order, either as a negotiated "Compliance Order on Consent" or a unilateral "Compliance Order."[4]

The Act also grants enforcement authority to ordinary people who suffer when polluters violate emission standards to "encourage defendants to discontinue current violations and deter … future ones." *Friends of the Earth,*

---

[3] APCD, *Compliance Assistance & Enforcement Guide* 15 (rev. Nov. 2017), https://oitco.hylandcloud.com/POP/DocPop/DocPop.aspx?docid=%205101399 ("Enforcement Guide").

[4] Enforcement Guide at 17.

*Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 186 (2000) (discussing the Clean Water Act's analogous provision). As relevant, "any person" may bring "a civil action on his own behalf" against a polluter "alleged ... to be in violation of … an emission standard or limitation." 42 U.S.C. § 7604(a)(1). "Emission standard or limitation" is defined broadly to include, among other things, federal and state emission limitations and permit conditions. *Id.* § 7604(f); *see also Utah Physicians*, 21 F.4th at 1250. A court may "enforce" the standard through equitable relief and "any appropriate civil penalties" that are then paid into the U.S. Treasury. *Id.* § 7604(a), (g); *see also id.* § 7413(e) (setting penalty factors).

The Act expressly addresses the relationship between citizen suits and government enforcement efforts in detail. Before suing, plaintiffs must give sixty-days' notice of the violation to both the violator and regulators to give them an opportunity to take action that would obviate the necessity of a citizen suit. *See* 42 U.S.C. § 7604(b)(1)(A); *Hallstrom v. Tillamook Cnty.*, 493 U.S. 20, 29 (1989). After the notice period expires, the plaintiff may "commence" a citizen suit unless EPA or a State "has commenced and is diligently prosecuting a civil action in a court of the United States or a State to require compliance with the standard, limitation, or order." 42 U.S.C. § 7604(b)(1)(B). If the government is

diligently prosecuting in court, the person may instead intervene as a matter of right in the government's action. *See id.*

But if a person provides the required notice and no judicial action is diligently underway to enforce the standard at issue, the Act allows them to sue. *See* H.R. 17255, 116 Cong. Rec. 42,387 (1970) (Conf. Rep.) (statement of Sen. Muskie) (describing provision as a "key element" in achieving "the air pollution goals which this bill undertakes").

## II.    Factual Background & Procedural History

### A.    Suncor's Commerce City Refinery

Suncor's refinery in Commerce City is one of the largest sources of air pollution in Colorado. App. Vol. I at 0020, ¶ 49 (Am. Compl.). It can refine up to 98,000 barrels of crude oil per day at three main operating plants. *Id*. at 0019, ¶ 45. Plants 1 and 3 are an integrated operation, referred to collectively as the West Plant. *Id.* ¶ 47. Plant 2 is referred to as the East Plant. *Id.* ¶ 48.

Over 200 different units at the plants emit air pollutants. *Id*. at 0021, ¶ 57. The units include—as most relevant—thirty-six fuel gas combustion devices (such as process heaters or boilers) which burn refinery fuel gas to generate steam or to heat other materials as part of the refining process; three sulfur recovery units ("SRUs"), which remove sulfur compounds from gases, including the refinery fuel gas; two fluid catalytic cracking units ("FCCUs"),

which break down heavier fuel into lighter fuels like gasoline; and four open-air flares used to control emissions of pollutants or waste gases. *Id.* at 0022-24, ¶¶ 58-71.

These distinct units are subject to distinct emissions standards, for distinct pollutants.

For example, the FCCUs must meet standards that specifically limit emissions of metallic hazardous air pollutants like cadmium and chromium. *Id.* at 0034, 0044, ¶¶ 126, 178, 180. These pollutants can cause cancer, decreased lung capacity, nervous system disorders, and reproductive and developmental disorders. *Id.* at 0034, ¶¶ 123-24. Long-term exposure can lead to accumulation of metals in the body, causing harm like kidney effects even after the exposure has ended. *Id.* ¶ 125.

As another example, the refinery's open-air flares must meet standards that limit emissions of hydrogen sulfide and sulfur dioxide, *id.* at 0037, 0040, ¶¶ 142, 157, and various other hazardous air pollutants, *id.* at 0046, ¶¶ 190-91. Hydrogen sulfide is a flammable gas that smells like rotten eggs and can cause eye and throat irritation, headaches, and tiredness at low concentrations and can be fatal at high concentrations. *Id.* at 0026-27, ¶ 87. Long-term exposure can cause low blood pressure, nausea, loss of muscle control, and more. *Id.*

Sulfur dioxide causes respiratory tract issues at low levels, and at high concentrations can cause death. *Id.* at 0028, ¶ 95.

The emission standards that apply to the refinery are consolidated into two Title V operating permits. *Id.* at 0024, ¶ 72. These permits also contain requirements that require Suncor to report events where units at the refinery emitted pollutants that exceeded a numeric limit or otherwise deviated from permit requirements. *Id.* at 0025, ¶ 79.

These two Title V permits apply to the West Plant and the East Plant. The West Plant permit was first issued on August 1, 2004 and was revised twice, including on July 9, 2024, the date of the currently operative permit. *Id.* at 0025, ¶ 77. The East Plant permit was first issued on October 1, 2006 and was revised twice, including on September 1, 2022, the date of the currently operative permit. *Id.* at 0024, ¶ 75.

Since the Title V permits were first issued, Suncor has made changes to units at the refinery that are reflected in subsequent permit revisions. *Id.* at 0025, ¶¶ 76, 78. Most significantly, Suncor installed two boilers at the East Plant. *See* App. Vol. IV at 0735 (listing startup date as Oct. 2011 for boilers B504 and B505). And it installed a flare, four heaters, and a sulfur recovery unit incinerator at the West Plant. *See* App. Vol. II at 0188-89 (listing startup date as Jan. 2006 for heater H-2101, Apr. 2006 for sulfur recovery incinerator

H-25, May 2006 for heaters H-1716 and H-1717, Apr. 2012 for the GBR Unit flare, and May 2012 for heater H-2410). Collectively, these changes added eight new emissions sources to the refinery, each subject to specific standards and emissions limitations in subsequently issued revised Title V permits.

**B.      Suncor's past violations and related consent decrees and administrative enforcement actions**

In the early 2000s, when the East and West Plants were separate facilities owned by separate corporations, EPA sued to address the refineries' violations, along with violations at other refineries around the country owned by these corporations. *See* App. Vol. IX at 1996 (West Plant, Conoco); App. Vol. X at 2019 (East Plant, Valero). The suits ended in 2002 and 2005, respectively, when district courts in Texas approved consent decrees and entered final judgments in the suits. *See* App. Vol. VI at 1122 (West Plant);[5] App. Vol. VII at 1359 (East Plant).

Broadly speaking, the two decrees resolved two categories of civil liability. *See* App. Vol. VII at 1537-49; App. Vol. VI at 1213-14. *First*, they resolved violations of new source review permitting requirements and any

---

[5] The West Plant decree has been amended twice to (1) reflect Suncor's purchase of the Denver refinery, *see* App. Vol. VI at 1267 (Aug. 5, 2003), and (2) amend certain provisions that are not relevant to GreenLatinos' claims, *id.* at 1317 (July 12, 2006). For simplicity, GreenLatinos cites paragraphs in the original consent decree.

resulting criteria pollutant emission increases from FCCUs, heaters, and boilers that were constructed or modified before the decree entered. App. Vol. VI at 1213, ¶¶ 271-72; App. Vol. VII at 1538-41, ¶¶ 344-49. For example, the West Plant decree states that it resolves liability for heaters and boilers that did not comply with new source review requirements "occurring prior to entry of" the decree. App. Vol. VI at 1213, ¶ 272. *Second*, the decrees resolved violations of NSPS Subpart J (and Subpart A), *see* Section I, above, at FCCUs, flares, heaters and boilers, and SRUs, that occurred before the consent decrees entered. App. Vol. VI at 1214, ¶ 274; App. Vol. VII at 1541, ¶ 351.

The terms of the parties' settlement fall into three primary categories. *First*, they established schedules for the refineries to complete operational tasks such as installing specified pollution control or monitoring equipment. *See, e.g.*, App. Vol. VI at 1171-72 (install a continuous emission monitoring system). The final compliance deadline specified in either decree relating to these operational tasks passed on March 31, 2012. *See* App. Vol. VII at 1375 (requiring submission of a report on average nitrogen oxides emissions from FCCUs). *Second*, the decrees established emission limits on certain pollutants for specific emission units, which were then incorporated into the Title V permits. App. Vol. I at 0049-50, ¶¶ 205-18. *Third*, the decrees required that certain previously-exempt units be subject to New Source Performance

Standards. App. Vol. VI at 1138-39, 1144, 1169, 1171; App. Vol. VII at 1412-13, 1416, 1467-75.

### C.     Suncor's present-day violations and the harm they cause to GreenLatinos

Fast forwarding a few decades to today, the refinery—now a single entity owned by Suncor—is violating multiple emissions standards, and those violations harm GreenLatinos' members who live, work, and recreate next to the facility. Just under 70,000 people live within three miles of the refinery; its closest neighbor lives less than half-a-mile away. App. Vol. I at 0021, ¶ 54. The area does not meet the National Ambient Air Quality Standard for ozone; the refineries' unlawful emissions contribute to that problem. *Id.* ¶ 56.

Suncor's recurring violations of important emission limits are undisputed and documented in its own reports to the state; these reports show thousands of days of enforceable violations. *Id.* at 0012, ¶ 2. For example, Suncor's reporting shows a single emission source exceeded a carbon monoxide limit adopted to control organic hazardous air pollutant emissions 62 times between 2020 and 2023.[6] *Id.* at 0072, ¶¶ 391-96; App. Vol. I at 0128. Organic hazardous air pollutants like benzene and formaldehyde can cause "(1) eye, nose, and

---

[6] Suncor's 2024 emission reports were not yet available when GreenLatinos sent its notice of intent to sue.

throat irritation, (2) respiratory problems, and (3) reproductive and developmental disorders." App. Vol. I at 0033, ¶ 119. Benzene is also a potent carcinogen while formaldehyde is a likely carcinogen. *Id.* ¶ 120.

Those who live nearby report experiencing the harms associated with pollutants subject to those limits. *Id.* at 0015-16, ¶¶ 20-24. Angela Garcia lives less than two miles from the refinery and can see air pollution from her house, including fine, thin, misty pollution and flaring from the refinery. App. Vol. IX at 1984, ¶ 8. At night she can smell an unpleasant, distinctly chemical smell, which instantly gives her a headache. *Id.* ¶ 9. Angela suffers from asthma, bronchitis, and pneumonia, which is exacerbated by polluted air. *Id.* ¶ 11. Using an inhaler helps her symptoms, but her use is limited by her restricted prescription and cost. *Id.* ¶ 12. Even when she uses an inhaler, she gets frustrated because it makes her tired, but unable to sleep, taking away from her ability to care for her house, her dog, and her community. *Id.* ¶ 13.

Neither the EPA nor APCD have brought civil actions to address these violations. Instead, Colorado has finalized two compliance orders on consent that administratively settled certain violations occurring before July 2021. *See* App. Vol. VIII at 1569 (violations between July 2017 and Dec. 2019); App. Vol. VIII at 1656 (violations between July 2019 and June 2021).

Since then, regulators have issued two notices to Suncor identifying other alleged violations. EPA issued a Notice of Violation (jointly with Colorado) in July 2024. *See* App. Vol. IX at 1730 (alleging violations between Jan. 2020 and Nov. 2023). Colorado issued a Compliance Advisory to Suncor in January 2025—five months after GreenLatinos filed suit. App. Vol. IX at 1871 (alleging violations between Jan. 2020 and Nov. 2023). Neither has led to an administrative order or a civil action in court, so the last violation that an agency enforced, even administratively, occurred in July 2021—more than four years ago. The vast majority of violations that GreenLatinos have alleged occurred after July 2021. App. Vol. I at 0086-0138.

On August 6, 2024, after complying with the Act's notice requirements, GreenLatinos sued. This was the first and only time these violations have been brought in court.

In the absence of the governments' diligent prosecution of Suncor's persistent and continuing violations, on August 6, 2024, GreenLatinos filed this action raising 28 claims for ongoing violations of distinct emissions standards that govern units at the refinery. *See generally* App. Vol. I at 0008-0085. These claims allege violations of multiple federal and state air quality regulations including exceeding limits controlling emissions of pollutants like sulfur dioxide, particulate matter, carbon monoxide, and various hazardous air

19

pollutants from various units under the NSPS and MACT standards, as well as

violations of RACT and other requirements of the Colorado SIP and

associated permits. *See generally, id.*

### D.       The District Court's dismissal of GreenLatinos' suit on diligent prosecution grounds

Suncor moved to dismiss GreenLatinos' suit arguing, as relevant here,

that GreenLatinos' claims are barred under the diligent prosecution bar based

on administrative enforcement of twenty-year-old federal consent decrees.

App. Vol. I at 0139.

In response, GreenLatinos explained why the motion lacked merit. They

began with the Clean Air Act's text and summarized the three requirements for

the diligent prosecution bar. *See* App. Vol. IX at 1949. *First*, the government

must be prosecuting an action *in court* when the complaint is filed. *Id.* (citing 42

U.S.C. § 7604(b)(1)(B)). *Second*, the action must be enforcing *the same standards*

as the citizen suit. *See id. Third*, the government's prosecution of the civil action

must be *diligent*. *Id.*

Given these three requirements, GreenLatinos explained that none of

their claims were barred. *First*, they alleged that neither EPA nor Colorado's

APCD were currently prosecuting a civil action in court against the refinery.

*See* App. Vol. IX at 1950. The twenty-year old consent decrees were final

judgments, not active cases, and Colorado's enforcement activities were purely

20

administrative. *See id.* at 1951. *Second*, the text and caselaw refutes Suncor's view that governmental enforcement of "similar" standards could bar a citizen suit. *See id.* at 1953-54. *Finally*, any governmental prosecution was not sufficiently "diligent" because, among other things, Suncor's violations had been going on for years. *See id.* at 1956-57; *see also* App. Vol. X at 2069 (GreenLatinos' chart with claim-by-claim response to Suncor's arguments).

On May 23, 2025, the District Court dismissed GreenLatinos' suit under Federal Rule of Civil Procedure 12(b)(6), holding that the diligent prosecution bar applied to all of GreenLatinos' claims.[7] The court did not address GreenLatinos' individual claims or the specific related emission standards and units. Instead, the court broadly referred to "the consent decrees, compliance orders, compliance advisories, and notice of violation" when "[t]aken together" and stated that they "served as ongoing enforcement actions" that barred GreenLatinos' claims "which consists of identical or substantially similar allegations." App. Vol. X at 2311.

---

[7] The District Court denied the motion as to GreenLatinos' standing, holding that GreenLatinos had adequately alleged an injury-in-fact traceable to Suncor's alleged violations. App. Vol. X at 2308.

## SUMMARY OF THE ARGUMENT

The District Court erroneously accepted Suncor's invitation to short cut the analysis required by the Act by lumping decades-old federal consent decrees with more recent state administrative actions and calling it diligent prosecution. But the Clean Air Act's plain text lays out a step-by-step process the District Court was required to follow. Because it did not, this Court should reverse.

**I.** The District Court improperly expanded the diligent prosecution bar's "prosecuting a civil action in a court" requirement to include administrative enforcement of twenty-year-old consent decrees. By its plain terms, the Clean Air Act's diligent prosecution bar only bars a claim in a citizen suit if EPA or a State files a *civil action in court* before the citizen suit is filed and the agency *is still prosecuting* the action at the time the citizen suit is filed. 42 U.S.C. § 7604(b)(1)(B). That is, the action must be ongoing, and in court. None of the actions that Suncor identified trigger the diligent prosecution bar because (1) the twenty-year-old decrees ended the civil actions and are no longer "prosecuting a civil action in a court," and (2) the administrative compliance orders and violation notices are not "civil action[s] in a court."

**II.** GreenLatinos' claims do not allege violations of the same standards enforced by the consent decrees. Nonetheless, the District Court dismissed the

complaint on the grounds that undifferentiated terms of the consent decrees amounted to identical or *similar* standards that triggered the diligent prosecution bar. But the plain terms of the Act only bar claims if the government's civil action sought compliance with the *same* emission standard as the citizen suit claims. *See* 42 U.S.C. § 7604(a), (f). The majority of the standards GreenLatinos allege were violated did not even exist at the time the decrees were entered, and many relate to units that were installed after the decrees or control pollutants not covered in the decrees.

**III.** GreenLatinos alleged adequate facts, taken as true, to show that any prosecution was not "diligent." For example, the amended complaint alleges that Suncor's violations have continued for years despite any administrative enforcement efforts by the State, the decrees were twenty years old and that all the required substantive work has long been completed, and that neither EPA nor the State have filed an action in court to enforce the decree or the Act, leaving GreenLatinos no alternative to bringing their own action to hold Suncor accountable.

## STANDARD OF REVIEW

This Court reviews a district court's dismissal of a complaint under Rule of Civil Procedure 12(b)(6) "de novo, accepting all well-pleaded allegations of the complaint as true and considering them in the light most favorable to the

[plaintiffs]." *Johnson v. Smith*, 104 F.4th 153, 167 (10th Cir. 2024) (quotation omitted).

## ARGUMENT

**I.    The Diligent Prosecution Bar Does Not Apply to Any of GreenLatinos' Claims Because No Government "Is Prosecuting A Civil Action In A Court"**

The diligent prosecution bar does not apply because no government was "prosecuting a civil action in a court" when GreenLatinos filed suit. App. Vol. I at 0057, ¶ 260. By its plain terms, the Clean Air Act's diligent prosecution bar applies only if a government "has commenced and *is* diligently prosecuting *a civil action in a court*." 42 U.S.C. § 7604(b)(1)(B) (emphasis added). That requires that any government enforcement action is (1) *ongoing* and (2) *in court*. None of the actions that Suncor identified as triggering the diligent prosecution bar meet those requirements. The consent decrees *ended* civil actions, meaning the government no longer "is … prosecuting" them in court. The other referenced actions—two administrative compliance orders and two violation notices—are each an *administrative* action, not "a civil action in a court." The District Court therefore erred in holding that the diligent prosecution bar applied as a result of either type of actions. *See* App. Vol. X at 2312 ("An administrative action enforcing a court-ordered consent decree—as is the case here with the EPA's and Colorado's recent Compliance Orders, Compliance

24

Advisories, and Notice of Violation—is sufficient to trigger the diligent prosecution bar.").

### A.      Consent decrees are final judgments, not "a civil action in a court" that the government "is … prosecuting"

The diligent prosecution bar speaks in the present tense. It applies only if the government "has commenced and *is* ... prosecuting a civil action." 42 U.S.C. § 7604(b)(1)(B) (emphasis added). That textual choice must be given effect. *See Sierra Club v. Two Elk Generation Partners, Ltd. P'ship*, 646 F.3d 1258, 1264 (10th Cir. 2011) (referring to "Congress's deliberate use of verb tense in the [Clean Water Act] citizen suit provision").

In contrast, consent decrees mark the *end* of a civil action, after which the government is no longer prosecuting. As this Court has explained, "a district court's order approving the consent decree is tantamount to a final judgment on the merits." *Jackson v. Los Lunas Cmty. Program*, 880 F.3d 1176, 1198 (10th Cir. 2018). Thus, when a consent decree enters in a Clean Air Act enforcement suit, the government no longer "is ... prosecuting" the action that led to the consent decree, and the relevant court dockets are closed, as is the case here. App. Vol. X at 2057, 2066.

Congress "could have easily" written this provision more broadly, *Pub. Int. Rsch. Grp. of New Jersey, Inc. v. GAF Corp.*, 770 F. Supp. 943, 949 (D.N.J. 1991) (interpreting similar language under the Clean Water Act), and expressly

25

applied it to consent decrees, as it has elsewhere. *See* 42 U.S.C. § 6972(b)(2)(B)(iv) (RCRA provision barring citizen suit where EPA "has obtained a court order (including a consent decree)"). Or it could have required only that a government "has commenced" a civil action. Congress made another choice in the Clean Air Act, however, and its textual choice must be respected. *See Bostock v. Clayton Cnty.*, 590 U.S. 644, 658-59 (2020) ("Congress could have written the law differently. ... But ... that is not the law we have.").

Multiple courts that have addressed this question agree. For example, the Ninth Circuit reached this conclusion when addressing the same words in the Clean Water Act. *See Citizens for a Better Env't-California v. Union Oil Co.*, 83 F.3d 1111, 1114 (9th Cir. 1996). That statute also refers to an action that the government "has commenced and is diligently prosecuting." 33 U.S.C. § 1319(g)(6)(A).[8] There, the state enforcement agency had reached a settlement that resulted in the dismissal of a state suit and entry of a cease and desist order. *See Citizens for a Better Env't*, 83 F.3d at 1114. The court found it "plain that no action *is* being prosecuted at this time" under those circumstances. *Id.*

---

[8] The distinctions between the Clean Water Act and Clean Air Act discussed in Section I.B, below, discuss separate terms of the statutes and are not relevant here.

26

at 1118 (emphasis in original); *see also Knee Deep Cattle Co. v. Bindana Inv. Co.*, 94 F.3d 514, 516 (9th Cir. 1996) (entry of final order meant "it cannot be said that the state was diligently prosecuting an action" at the time of the citizen suit); *GAF Corp.*, 770 F. Supp. at 949 ("Notably, the statutory provision does not state that a citizen suit is barred if a state *has* prosecuted an action with respect to such violations, although Congress could have easily so provided" (emphasis in original)); *S. River Watershed All., Inc. v. Dekalb Cnty., Georgia*, 69 F.4th 809, 829-30 (11th Cir. 2023) (Newsom, J. concurring) (describing "reasonable arguments" in favor of this interpretation though issue was not raised).

The District Court suggested that this Court's decision in *Karr v. Hefner*, 475 F.3d 1192 (10th Cir. 2007), says otherwise, App. Vol. X at 2311-12, but it does not. In *Karr*, an EPA enforcement case *was pending in federal court* when the plaintiff filed its citizen suit, and the court *subsequently* entered a consent decree in EPA's case. *See Karr*, 475 F.3d at 1194-95 (describing timing of EPA suit and citizen suit). *Karr* turned on whether EPA's prosecution of the live case was diligent, *see id.* at 1197-98, not whether a polluter can shield itself with a closed case and claim that the government is prosecuting a civil action in court.

The upshot is that neither of the decrees the District Court relied on meet the very first requirement of the diligent prosecution bar, and the court erred by dismissing the case on this basis.[9]

### B.    An administrative enforcement action is not "a civil action in a court"

The Clean Air Act is equally clear that a *judicial* enforcement action is required to trigger the diligent prosecution bar; an administrative enforcement action cannot. The bar requires that the government be "diligently prosecuting *a civil action in a court* of the United States or a State." 42 U.S.C. § 7604(b)(1)(B) (emphasis added).

Unsurprisingly, "courts interpreting this provision have uniformly held that 'a civil action in court' means what it says" and that a government's purely administrative enforcement efforts do not trigger the bar. *Wildearth Guardians v. Lamar Utilities Bd.*, No. 11-CV-00742-MSK-MJW, 2012 WL 1059981, at *2 (D. Colo. Mar. 29, 2012) (unpublished) (citations omitted) (denying motion to dismiss based on APCD's administrative efforts). This court has similarly concluded that the general diligent prosecution bar in the

---

[9] The "prosecuting" question might be closer if, for example, the government had a pending motion for contempt of the consent decree, but as explained in Section III.A, neither EPA nor APCD have sought any court intervention since the decrees were entered.

Clean Water Act, 33 U.S.C. § 1365(b)(1)(B), precludes a citizen suit "when a state initiates *judicial proceedings* against a polluter. However, if a state only opts for administrative enforcement, then § 1365(b)(1)(B) will not apply." *Paper, Allied-Indus., Chem. And Energy Workers Int'l Union v. Cont'l Carbon Co.*, 428 F.3d 1285, 1298 (10th Cir. 2005). Other courts of appeal agree. *See Texans United for a Safe Econ. Educ. Fund v. Crown Cent. Petroleum Corp.*, 207 F.3d 789, 795 (5th Cir. 2000); *Jones v. City of Lakeland*, 224 F.3d 518, 522 (6th Cir. 2000) (en banc); *Sierra Club v. Chevron U.S.A., Inc.*, 834 F.2d 1517, 1525 (9th Cir. 1987); *Friends of the Earth v. Consolidated Rail Corp.*, 768 F.2d 57, 59 (2d Cir. 1985).

Comparing the diligent prosecution bars in the Clean Air Act and the Clean Water Act reinforces the plain-text reading of the Clean Air Act. The Clean Water Act includes a bar that is substantially the same as the Clean Air Act and is limited to judicial enforcement. 33 U.S.C. § 1365 (barring a citizen suit if the government "is diligently prosecuting a civil … action in a court"). However, the Clean Water Act includes a *second* diligent prosecution bar that applies only to administrative enforcement actions. 33 U.S.C. § 1319(g)(6). These provisions—unlike anything in the Clean Air Act—expressly refer to something "less than judicial enforcement, such as enter[ing] into a[n administrative] consent order." *See Paper, Allied-Indus.*, 428 F.3d at 1298.

Here too, Congress "could easily have" written the Clean Air Act's diligent prosecution bar "to preclude citizen suits in the face of an administrative compliance order." *Washington Pub. Int. Rsch. Grp. (Wash PIRG) v. Pendleton Woolen Mills*, 11 F.3d 883, 886 (9th Cir. 1993). Congress did just that in other environmental statutes. *See id.* (citing RCRA, 42 U.S.C. § 6972(b)(2)(B)(iv), and CERCLA, 42 U.S.C. § 9659(d)(2)); *see also* 42 U.S.C. § 11046(e) (EPCRA, barring citizen suit if EPA "is diligently pursuing an administrative order or civil action to enforce the requirement"). Thus, the choice not to do so in the Clean Air Act must be given effect. *See Bostock*, 590 U.S. at 658-59.

Looking to the Clean Water Act's second bar does not just confirm that Congress intentionally made different choices in the Clean Air Act, it also shows how overriding those choices would usurp Congress' goal of ensuring public participation in enforcement of environmental laws. In both statutes, Congress both (1) chose what set of enforcement actions could trigger a diligent prosecution bar, and at the same time (2) guaranteed that the public would have the ability to participate in any action that did trigger the bar. Under the Clean Air Act, if a citizen's *own* suit is barred by a government enforcement action in court, they "may intervene as a matter of right" in that suit. 42 U.S.C. § 7604(b)(1)(B). And the Clean Water Act lays out clear public

30

participation requirements for the administrative enforcement actions that trigger its diligent prosecution bar. *See, e.g.*, *McAbee v. City of Fort Payne*, 318 F.3d 1248, 1256 (11th Cir. 2003) (noting requirements for comment periods, the ability to present evidence, and to seek a hearing); *Paper, Allied-Indus.,* 428 F.3d at 1295 (noting right of judicial review); *see also* 33 U.S.C. § 1319(g)(4). In sum, both provisions exist to avoid parallel enforcement proceedings but *expressly preserve* public participation when doing so.

Expanding the Clean Air Act's diligent prosecution bar to cover administrative actions, as the District Court did, would break the symmetry between these two statutes. For one thing, despite the textual focus on preserving public participation, the District Court's reading precludes a citizen suit based on administrative actions with no guarantee of being able to participate to protect themselves. For instance, neither the Clean Air Act nor Colorado law provide any opportunity for public involvement in administrative enforcement. *See* 42 U.S.C. § 7413 (Clean Air Act provision including no such requirements); C.R.S. § 25-7-115 (same); *contrast* 33 U.S.C. § 1319(g)(4) (Clean Water Act participation requirements). For another, the District Court's reading would preclude a person's suit based on potentially any type of administrative action, whereas the Clean Water Act specifies which administrative actions trigger the bar. *See, e.g.*, *Naturaland Tr. v. Dakota*

*Fin. LLC*, 41 F.4th 342, 348 (4th Cir. 2022) (citing 33 U.S.C. 1319(g)(4), 40 C.F.R. §§ 22.13, 22.38) (only formal actions like filing a complaint or issuing a penalty order can qualify as commencing an "action;" a notice of violation cannot).

Moreover, simply lumping the administrative actions together with the twenty-year-old decrees—as the District Court did here, App. Vol. X at 2311—is contrary to the plain text of the Act. Congress expressly excluded administrative actions from the Clean Air Act's diligent prosecution bar, and as noted previously, Congress knows how to explicitly apply the bar to previously issued consent decrees. *See* 42 U.S.C. § 6972(b)(2)(B)(iv) (RCRA citizen suit barred where EPA "has obtained a court order (including a consent decree)"). Later administrative actions cannot perpetually revive ongoing enforcement in court. *See Friends of Milwaukee's Rivers v. Milwaukee Metro. Sewerage Dist.,* 382 F.3d 743, 753 n.5 (7th Cir. 2004).

To reach such a contrary conclusion, the District Court relied on two cases. One did not address this question. The other departed from the statutory text on the basis of policy concerns and so fails to persuade.

Again, the District Court relied on *Karr,* App. Vol. X at 2311-12, but nothing in *Karr* addressed whether later administrative enforcement actions could continue the original prosecution. In *Karr*, the only question was

32

whether EPA's prosecution of the enforcement case was diligent. In concluding that it was, the Tenth Circuit presumed EPA's diligence in negotiating the consent decree to ensure that the citizen suit does not "undermine the EPA's ability to reach voluntary settlements with defendants." 475 F.3d at 1198. *Karr* thus does not support allowing administrative enforcement of a consent decree entered long before a suit began to trigger the diligent prosecution bar.

The District Court also relied on *Grp. Against Smog and Pollution, Inc. v. Shenango, Inc.* ("*GASP*"), 810 F.3d 116, 128 (3rd Cir. 2016). App. Vol. X at 2312. But *GASP* rejected the plain text of the "prosecuting" requirement, criticizing contrary case law for "rely[ing] on a literal, inflexible, or grammatical" interpretation of the statute. *GASP*, 810 F.3d at 129. Instead, the court relied on policy arguments and legislative history. *See id.* That is not how this Court interprets statutes, including the diligent prosecution bar. *See Cont'l Carbon Co.*, 428 F.3d at 1298 (rejecting arguments that contradicted "[a] strict reading of" the Clean Water Act's diligent prosecution bar). What is more, *GASP* did not rely on administrative enforcement actions; it expressly relied on two consent decrees and took pains to emphasize their recency—one entered days before the citizen suit was filed. 810 F.3d at 129-30 (emphasizing recency and vitality of consent decrees; expected termination in three years). GASP's

33

reasoning does not extend to garden-variety administrative enforcement of twenty-year-old consent decrees.

### C.     The District Court's policy concerns cannot override the plain text and are also misplaced

The District Court's understanding of the diligent prosecution bar appeared to rest in part on its concern that suits like this one might risk "undercut[ting] the EPA's and Colorado's enforcement efforts." App. Vol. X at 2313. These concerns cannot justify expanding the diligent prosecution bar beyond its plain text. As the Ninth Circuit stated in a similar case, "general arguments about congressional intent and the EPA's need for discretion cannot persuade us to abandon the clear language that Congress used when it drafted the statute." *Wash PIRG*, 11 F.3d at 886. "Congress recognized and addressed the specific clash of interests at issue here, by carefully delineating (via the diligent prosecution bar) the situations in which a state or federal agency's enforcement efforts will foreclose review of a citizen suit in federal court." *Chico Serv. Station, Inc. v. Sol Puerto Rico Ltd.*, 633 F.3d 20, 31 (1st Cir. 2011). Expanding the diligent prosecution bar "would substitute [the court's] judgment for that of Congress about the correct balance between respect for state administrative processes and the need for consistent and timely enforcement of [the Act]" *Id.*; *see also Kentucky Waterways All. v. Kentucky Utils. Co.*, 905 F.3d 925, 939-40 (6th Cir. 2018).

34

Indeed, Congress has already addressed the District Court's concerns. Congress ensured that citizen suits will not interfere with EPA enforcement by providing EPA an absolute right to (1) bar a citizen suit by filing its own civil action in court during the sixty-day citizen suit notice period, 42 U.S.C. § 7604(b), or (2) intervene in any citizen suit and comment on any proposed settlement, *id.* § 7604(c)(2)-(3). If EPA does not intervene, the United States is not bound by the judgment in a citizen suit. *See id.* Congress also addressed concerns about violators being subject to duplicative requirements. When setting any civil penalty, courts must consider various factors including "the violator's full compliance history and good faith efforts to comply, ... [and] payment by the violator of *penalties previously assessed for the same violation*." 42 U.S.C. § 7413(e)(1) (emphasis added).[10]

Finally, as this Court has recognized before, other legal doctrines can address the District Court's concerns. For example, in *Two Elk*, the court held that the diligent prosecution bar was not triggered but that administrative adjudications nonetheless barred plaintiff's claims under the collateral estoppel doctrine. 646 F.3d at 1272. Other courts have considered whether certain

---

[10] *See also* EPA, Clean Air Act Stationary Source Civil Penalty Policy at 21 (Oct. 25, 1991), *available at* https://www.epa.gov/sites/default/files/documents/penpol.pdf (discussing "offsetting penalties paid to state and local governments or citizen groups for the same violations") (cleaned up).

agency actions have mooted citizen suit claims. *See Friends*, 382 F.3d at 757-65. The advantage of applying these doctrines is that, contrary to ad hoc extensions of the diligent prosecution bar, these doctrines have well-developed caselaw and defined requirements.

## II.    The Diligent Prosecution Bar Does Not Apply Because GreenLatinos' Claims Do Not Allege Violations of the Same "Emission Standards or Limitations" As the Consent Decrees

The Clean Air Act's diligent prosecution bar is triggered only if there is an existing government enforcement action "to require compliance with *the* standard, limitation, or order" that a person seeks to enforce in their own suit. 42 U.S.C. § 7604(b)(1)(B) (emphasis added). That is, the person's suit must be seeking to enforce *the same* standard at issue in the suit the government is diligently prosecuting. The District Court held that this requirement was met because the claims here "consist[] of identical or substantially similar allegations" to the "the consent decrees, compliance orders, compliance advisories, and notice of violation." App. Vol. X at 2311. In doing so, it erred in two ways. *First*, the District Court failed to adhere to the plain text of the statute by concluding that *similar*, and not just the same, standards can trigger the bar. *Second*, GreenLatinos' claims do not seek to enforce the same emission standards that the decrees were enforcing.

36

### A. Mere *similarity* of standards impermissibly weakens the Act's requirement, which refers to *"the* standard"

The plain text of the Clean Air Act's diligent prosecution bar requires a one-to-one relationship between the standard a person alleges violations of and the standard in the government's prosecution. The Act allows a person to "commence a civil action on his own behalf" against a person violating "an emission standard or limitation." 42 U.S.C. § 7604(a)(1). Successful plaintiffs can ask the district court "to enforce such an emission standard or limitation" and "to apply any appropriate civil penalties." *Id.* § 7604(a). But that action "may [not] be commenced" if a government "has commenced and is diligently prosecuting a civil action in a court ... to require compliance with the standard, limitation, or order." *Id.* § 7604(b)(1)(B). In sum, in three places the Act focuses on the precise standard a person seeks to sue over: to authorize the suit, to describe a court's remedial authority, and to establish the scope of the bar.

By referring to "similar" standards, the District Court incorrectly added words to the text. The text's "reference to 'the' [] standard makes clear that it must be the same standard, limitation, or order that is the subject of the citizen suit" at issue. *See California Sportfishing Prot. Alliance v. Chico Scrap Metal, Inc.*, 728 F.3d 868, 874 (9th Cir. 2013). A government action can only bar a citizen suit when both actions seek to require compliance with the *same* standard.

Courts consistently reach exactly this conclusion. The bar applies only to a claim to require compliance with "the *same* 'standard, limitation, or order' as the government enforcement action." *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 894 F.3d 1030, 1039 (9th Cir. 2018); *see also Berry v. Farmland Indus., Inc.*, 114 F. Supp. 2d 1150, 1157-58 (D. Kan. 2000) ("The present claim was not mentioned within the four corners of the 1996 consent decree and, therefore, was not resolved by the entry of the consent decree"); *Frilling v. Vill. of Anna*, 924 F. Supp. 821, 836 (S.D. Ohio 1996) ("citizen suits are barred only if they are based on the *very* same standards") (discussing the analogous Clean Water Act). "To conclude otherwise would defeat the purpose of the citizen suit provision, which is to provide a mechanism for a private plaintiff to enforce the [Clean Air Act]." *Glazer v. Am. Ecology Env't Servs. Corp.*, 894 F. Supp. 1029, 1035 (E.D. Tex. 1995) (citation omitted).

The judicial penciling in of the word "similar" into the Act would create numerous problems. *First*, it would upset the intentional choices and the balance between citizen and government enforcement roles that Congress struck in the Act. *See* Section I.C, above. *Second*, it would leave courts with even more statutory drafting to do in future cases: What counts as similar? Is it a standard governing emissions of the same pollutant, from the same unit, at

38

the same plant? Is it a standard seeking to address the same NAAQS pollutant through different means? Is it any standard applicable to the same unit, regardless of pollutant? Any standard at the same plant? That the text does not provide answers to these questions only confirms that the statute does not cover "similar" standards, only "the" same ones at issue in the citizen suit.

Even more concerning, the District Court did not explicitly compare the standards involved in the government and citizen actions, raising the specter that the government action would merely involve the same *statute* to preclude a subsequent citizen suit. Yet the Clean Air Act directs that the court examine whether the claims involve the same "standard, limitation, or order" as the federal civil action. 42 U.S.C. § 7604(b)(1)(B).

A comparison of the claims, however, demonstrates that none are the same.

**B.      None of GreenLatinos' claims seek to require compliance with the same standards as the decrees.**[11]

**1.      RACT Standards (Claims 4, 15, 20, and 22)**

GreenLatinos alleged four claims related to violations of Colorado RACT requirements. *See* App. Vol. I at 0066-67, ¶¶ 339-47 (four); *id.* at 0074-

---

[11] GreenLatinos reference standards enforced by the decrees, and not the administrative actions, because only the decrees qualify as actions "in a court."

75, ¶¶ 409-15 (fifteen); *id.* at 0078, ¶¶ 442-48 (twenty); *id.* at 0079-80, ¶¶ 456-62 (twenty-two). The decrees did not, and could not have, enforced these standards.

*First*, the RACT requirements were added to the permits *after* the decrees were entered; the decrees could not have included them because they did not exist at the time. App. Vol. II-III at 172 (West Plant permit), App. Vol. IV-V at 725 (East Plant Permit).

*Second*, most of the units subject to RACT requirements were first installed only after the decrees were entered. *See* App. Vol. II at 0188-89 (GBR Unit Flare (2012); Heaters 1716, 1717, 2101 (2006); SRU Tail Gas Incinerator (H-25) (2006)). The decrees could not have been enforcing violations of standards at units that did not exist.

*Third*, the decrees never mention, let alone enforce, RACT requirements. As explained above, they were enforcing a limited number of emission standards, App. Vol. VI at 1123, and the RACT limits were not one of them.[12]

---

Standards only addressed in the administrative actions were never enforced in court and cannot trigger the diligent prosecution bar. *See* Section I.B.

[12] In fact, even the administrative actions do not enforce the RACT violations. *See* App. Vol. VIII at 1569; *id*. at 1656. In those actions, RACT requirements are only mentioned once, in reference to uncontrolled VOC releases, *id.* at 1581, which GreenLatinos is not seeking to enforce.

## 2. MACT Standards (Claims 6, 9, 12, 18, 21, 23, 27, and 28)

Seven of GreenLatinos' claims allege violations of two MACT subparts, MACT CC and MACT UUU. App. Vol. I at 0068, ¶¶ 354-59 (six); *id.* at 0070, ¶¶ 372-77 (nine); *id.* at 0072, ¶¶ 391-96 (twelve); *id.* at 0076-77, ¶¶ 429-35 (eighteen); *id.* at 0078-79, ¶¶ 449- 55 (twenty-one); *id.* at 0080, ¶¶ 463-69 (twenty-three); *id.* at 0083, ¶¶ 490-93 (twenty-seven); *id.* at 0083-84, ¶¶ 494-97 (twenty-eight). None of these claims are covered by the decrees.

*First*, like the RACT standards, most of the MACT standards did not take effect until after the decrees were entered. Claims 21, 23, 27, and 28 concern standards adopted in 2015, *see* 80 Fed. Reg. 75178 (Dec. 1, 2015), about a decade after the decrees. The Claim 9 standard took effect in 2017. *See* 40 C.F.R. § 63.1564(a)(2). Meanwhile, the standards in Claims 6, 12, and 18 took effect in April 2005, *see* 40 C.F.R. § 63.1563(b), after the West Plant decree and a few months before the East Plant decree.

*Second*, the alleged violations concern hazardous air pollutants not addressed by the decrees. The MACT UUU violations GreenLatinos allege (Claims 6, 9, 12, 18, and 27) concern organic and metallic hazardous air pollutants, App. Vol. I at 0033, ¶ 115, and the MACT CC violations (Claims 21, 23, and 28) concern twenty-seven hazardous air pollutants, *id.* ¶ 118. However, the only hazardous air pollutant mentioned in the decrees is

benzene, and only in relation to specific leak detection and benzene-specific emission standards, neither of which relate to GreenLatinos' claims. App. Vol. VI at 1214-15; Vol. VII at 1542-43.

### 3.   NSPS Subpart Ja (Claims 2 and 11)

Claims 2 and 11 allege violations of NSPS Subpart Ja. App. Vol. I at 0064-65, ¶¶ 315-29 (two); *id.* at 0071-72, ¶¶ 384-90 (eleven). The decrees did not, and could not, cover Subpart Ja violations because Subpart Ja, which was promulgated in 2008, only applies to units that were constructed or modified *after* the decrees were entered. *See* 40 C.F.R. § 60.100a(b) (applies only to units constructed or modified after May 14, 2007 at the earliest); 73 Fed. Reg. 35838 (June 24, 2008) (adopting NSPS Subpart Ja).

### 4.   SIP Provisions (Claims 7, 8, and 24)

GreenLatinos alleges three claims for violations of Colorado Reg. 1, which is incorporated into Colorado's state implementation plan. App. Vol. I at 0069, ¶¶ 360-65 (seven); *id.* at 0069-70, ¶¶ 366-71 (eight); *id.* at 0075, ¶¶ 470-77 (twenty-four). Like the Colorado RACT standards, the decrees do not mention, let alone enforce, Colorado Reg. 1.[13] The only SIP provisions the

---

[13] These standards, which govern the opacity of a polluter's emissions, are also markedly different from the opacity limits in federal New Source Performance Standards cited in the decrees. Claim 8 alleges violations of the SIP's 20% opacity limit, App. Vol. I at 0069, ¶ 367, which is far more stringent than

decrees claim were violated were those implementing the new source review permitting program, App. Vol. VII at 1537, ¶ 343(a), App. Vol. VI at 1124, which are not relevant to GreenLatinos' claims.

### 5.    Permit Violations (Claims 3 and 19)

Claims 3 and 19 allege violations of emissions limits established in Suncor's permits. App. Vol. I at 0065-66, ¶¶ 330-38 (three); *id.* at 0077, ¶¶ 436-41 (nineteen). The decrees did not, and cannot, cover these claims.

*First*, the emission units covered in both claims were first installed several years *after* the consent decrees were entered. *See* App. Vol. IV at 0735 (Boilers B504 and B505 installed in 2011); App. Vol. II at 0188 (H-25 installed in 2006).

*Second*, contrary to Suncor's assertions to the District Court,[14] there is no overlap between provisions of the decrees discussing NSPS Subpart J, *see* following section, and these claims. Subpart J *does not* apply to Boilers B504

---

Subpart J's 30% opacity limit, 40 C.F.R. § 60.102(a)(2). Claim 24 alleges violations of the SIP's 30% opacity limit on flares, App. Vol. I at 0081, ¶ 471, while there is no opacity limit in 40 C.F.R. § 60.18 cited by Suncor, *see generally* App. Vol. X at 2069-80. Claim 7 alleges violations of the SIP's 30% opacity limit during very specific activities at a source, such as cleaning control equipment, process modification, and start-up. App. Vol. I at 0069, ¶ 361. Nothing in the NSPS regs apply to these activities.

[14] App. Vol. V at 1118 (claiming limit is similar to West Plant consent decree ¶ 171 requiring NSPS Subpart J to apply to SRUs).

and B505. App. Vol. IV at 0776-77. The permit condition is an independent requirement created by APCD. App. Vol. I at 0055-56, ¶¶ 248-52. Meanwhile, Claim 19 alleges violations of a 15.68 lb/hour emission limit on Heater H-25, App. Vol. I at 0077-78, ¶¶ 436-48, and there is no analogue in NSPS Subpart J.

### 6.    NSPS Subpart J (Claims 1, 5, 10, and 17)

GreenLatinos alleged four claims for violations of NSPS Subpart J, which applies to several categories of pollution sources at the refinery. App. Vol. I at 0062-63, ¶¶ 300-14 (one) (fuel gas combustion units, including flares); *id.* at 0067-68, ¶¶ 348-53 (five) (FCCUs); *id.* at 0071, ¶¶ 378-83 (ten) (same); *id.* at 0076, ¶¶ 422-28 (seventeen) (SRUs). As noted in the Statement of the Case, Section I, above, Subpart J is one of the main federal regulations that applies to petroleum refineries. Unlike GreenLatinos' other claims above, the Subpart J regulation did at least exist when the decrees were entered, and the decrees do mention Subpart J. Regardless, the decrees still do not bar GreenLatinos' claims alleging Subpart J violations.

The decrees include provisions stating that the requirements of NSPS Subpart J (along with Subpart A, 40 C.F.R. § 60.1, et seq.) shall apply to all FCCUs, SRUs, flares, and fuel gas combustion units at Suncor—and the other Conoco and Valero refineries subject to the decrees. App. Vol. VI at 1144, ¶ 69, App. Vol. VII at 1410-11, ¶ 104. Before the decrees were entered, similar

units were subject to very different requirements depending on whether they were constructed before or after Subpart J was adopted; units constructed before were entirely exempt from NSPS requirements. *See* 40 C.F.R. § 60.100(b). The practical, beneficial effect of the decrees was to establish uniformity in the regulation of all similar units at the refineries, *compare* App. Vol. II at 0250, ¶ 13.3 (stating decree triggered Subpart J for boiler); *with id.* at 0254, ¶ 14.3 (heater regulated by Subpart J without citation to decree), and, in fact, at refineries nationwide.[15] Consequently, sources that were previously exempt from NSPS requirements now had to satisfy the same requirements as similar units that were already covered by the regulation. *See, e.g.*, App. Vol. VII at 1541 (previously regulated units unaffected).

None of these decree provisions enforced any emissions standard, let alone the same standards as GreenLatinos' claims.

*First*, since Subpart J did not apply to the relevant Suncor units before the decrees was entered, the decrees did not, and could not have been, enforcing the Subpart J violations alleged in GreenLatinos' complaint.

---

[15] The decrees were part of EPA's Petroleum Refinery Initiative, App. Vol. VI at 1123, involving settlements with refineries throughout the country, *see* EPA, Petroleum Refinery National Case Results, https://www.epa.gov/enforcement/petroleum-refinery-national-case-results.

*Second*, even if the decree provisions requiring Subparts A and J to apply could be interpreted as enforcement measures, which they cannot, that broad, general requirement is far too vague to qualify as enforcement of the same standards as GreenLatinos' claims. NSPS Subparts A and J include 29 separate sections and a broad range of numeric emission limits, technology requirements, monitoring requirements, and reporting requirements. *See* 40 C.F.R. §§ 60.1-60.19; *id.* §§ 60.100-60.109. Importantly, the decrees do not identify any particular standards supposedly violated by the units at the time the decrees were entered, rendering it impossible to draw any connection between GreenLatinos' claims and the decrees' requirements and conclude that they arise from violations of the "same" standard. As a result, GreenLatinos' claims are not barred.

### 7.    Consent Decree Limits (Claims 13, 14, 16, and 25)

Finally, Claims 13, 14, 16, and 25 allege violations of the permit limits specified in the decrees. App. Vol. I at 0073, ¶¶ 397-402 (thirteen); *id.* at 0073, ¶¶ 403- 08 (fourteen); *id.* at 0075, ¶¶ 416-21 (sixteen); 0081-82, ¶¶ 478-85 (twenty-five). These limits did not exist prior to entry of the decrees and therefore could not have been enforced by the decrees. The fact that the decrees required future permits to include these limits is irrelevant to the analysis. This is setting the standard, not enforcing the standard. *See, e.g., City*

*of Fairborn v. U.S. Env't Prot. Agency*, No. 3:22-CV-102, 2024 WL 555929, at *6 (S.D. Ohio Feb. 12, 2024) (unpublished) (consent decrees do not bar claims for violations of the decrees themselves).

Additionally, as a matter of logic, the decrees themselves could not amount to enforcement of the standards created therein because the standards they imposed did not even apply until after the decrees were entered. And subsequent violations of limits set by the decrees are fair game for citizens' suits when the government has not already sought to enforce those standards in court. Accordingly, GreenLatinos' claims are not barred by the decrees.

## III.    The Diligent Prosecution Bar Does Not Apply because Any Government Prosecution was Not "Diligent"

GreenLatinos alleged sufficient facts, taken as true, to show that any prosecution was not diligent, and the District Court erred in holding that GreenLatinos was required to prove lack of diligence at the pleading stage.

Despite the plain text of the statute requiring that the government be currently prosecuting in court, *see* Section I, above, some cases have misapplied the diligent prosecution bar to completed consent decrees, *see* Section III.A, below (discussing cases). While those cases improperly apply the diligent prosecution bar (without considering other potential legal mechanisms for addressing their concerns, *see* Section I.C., above,) no court has defined a specific standard for evaluating the diligence of administrative enforcement of

47

a consent decree.[16] As one commentator has noted, "Courts often fail to

distinguish between prosecution that is ongoing, prosecution that is seeking

compliance with an order requiring future action, and prosecution that has

been completely resolved" so the case law is "often muddy with regard to

whether they are analyzing expediency of process or effectiveness of results."

Jeffrey G. Miller, *Theme and Variations in Statutory Preclusions Against Successive*

*Environmental Enforcement Actions by EPA and Citizens Part One: Statutory Bars in*

*Citizen Suit Provisions*, 28 Harv. Env't. L. Rev. 401, 463 (2004). This means that

"[c]ourts often reach diametrically opposite conclusions based on virtually the

same facts." *Id.* at 469.

Regardless, even the courts that have applied the diligent prosecution bar

to pre-suit consent decrees recognize that a consent decree does not

"automatically immunize a polluter from all citizen suits." *S. River Watershed*

*All., Inc. v. Dekalb Cnty., Georgia*, 484 F. Supp. 3d 1353, 1368 (N.D. Ga. 2020).

---

[16] Some courts have cited the Seventh Circuit's test in *Friends* that "examine[d] whether [the consent decree] is capable of requiring compliance with the Act and is in good faith calculated to do so." *Friends*, 382 F.3d at 760 (cleaned up); *see Ohio Valley Env't Coalition, Inc. v. Hobet Min., LLC,* 723 F. Supp. 2d 886, 906 (S.D.W. Va. 2010); *St. Bernard Citizens for Env't Quality, Inc. v. Chalmette Refining, LLC*, 500 F. Supp. 2d 592, 604 (E.D. La. 2007). However, *Friends* concerned a consent decree entered while the citizen suit was pending, so it only considered the agency's diligence in establishing the consent decree itself. *Friends*, 382 F.3d at 751.

Instead, courts must "probe ... events transpiring post-entry of the consent decree." *Id.; see also Cebollero-Bertran v. Puerto Rico Aqueduct & Sewer Auth.*, 4 F.4th 63, 75 (1st Cir. 2021).

Here, GreenLatinos adequately alleged that any prosecution of the standards in its claims was not diligent. Yet, the District Court erred in holding that administrative actions qualified as diligent prosecution, which effectively adopts a new barrier to citizen suits involving any facility with an existing consent decree. The Act does not contemplate this harsh result.

A.     **GreenLatinos adequately alleged that any prosecution of the standards in its claims was not diligent**

GreenLatinos alleged adequate facts, taken as true, to conclude that any prosecution was not diligent in light of the substantial and ongoing violations at Suncor's facility.

*First*, Suncor's long history and "ongoing violations support the allegation of a lack of diligence." *Cebollero-Beltran*, 4 F.4th at 75. While continued violations "do[] not *necessarily* imply lack of diligence," *Karr*, 475 F.3d at 1197, when violations consistently persist or the consent decree cannot assure compliance, prosecution is not diligent, *Friends*, 382 F.3d at 764; *Ohio Valley Env't Coal. v. Bluestone Coal Corp.*, No. CV 1:19-00576, 2020 WL 2949782, at *8 (S.D. W. Va. June 3, 2020) (unpublished) (collecting cases); *cf. Lamar*, 2012 WL 1059981, at *3 (rejecting mootness argument because

violations continued despite prior consent orders). GreenLatinos alleged that violations have continued despite enforcement actions by APCD. App. Vol. I at 0013, 0056, ¶¶ 13, 256.

*Second*, the decrees here are over twenty-years old and all substantive work they required has been completed. App. Vol. VI at 1122; *id.* Vol. VII at 1358. Cases applying the diligent prosecution bar to consent decrees involve recent consent decrees with detailed remedial work still outstanding. *See S. River*, 69 F.4d at 816 (multi-year "comprehensive program" to rehabilitate sewer system); *Piney Run Pres. Ass'n v. Cnty. Comm'r of Carrol Cnty.,* 523 F.3d 453, 458 (4th Cir. 2008) ("multi-phase Environmental Project" with "various obligations and deadlines"); *Dodge v. Mirant Mid-Atlantic, LLC*, 732 F. Supp. 2d 578, 587 (D. Md. 2010) (requiring plans to address noncompliance and study of control technologies).

Here, the last substantive deadline in the decrees passed in 2012. App. Vol. VII at 1387, ¶ 55. All of the numeric emission limits in the decrees are self-executing, have been adopted into Suncor's permits, and would survive termination of the decree. App. Vol. VII at 1501-02, ¶ 291; *id.* at 1541, ¶¶ 351-52. While the decrees have not been terminated, that cannot be the deciding factor when evaluating diligence. Consent decrees cannot bar violations occurring after all work is completed. *See Friends*, 382 F.3d at 752.

*Third*, in the last twenty years, neither EPA nor the State have sought court action to enforce the decree. App. Vol. X at 2049 (*United States v. Valero Refining Co.*, Docket Report); *id.* at 2060 (*United States v. Conoco Inc.*, Docket Report). Many of the cases applying the diligent prosecution bar to consent decrees have relied on agencies seeking subsequent court intervention. *See GASP*, 810 F.3d at 120-21 (two consent decrees two years apart); *S. River*, 69 F.4th at 827 (prosecution diligent because regulators recently modified consent decree to address violations). What distinguishes a consent decree from a private settlement is the court's imprimatur and the opportunity to seek a contempt order for violations of the consent decree. *See, e.g., Consumers Gas & Oil, Inc. v. Farmland Indus., Inc.*, 84 F.3d 367, 370 (10th Cir. 1996); *see also Lackey v. Stinnie*, 145 S. Ct. 659, 671 (2025) ("Violation of a consent decree is enforceable by a citation for contempt. So a consent decree is like a final judgment in the relevant ways."). EPA and APCD's failure to seek court intervention in the last twenty years, despite Suncor's consistent violations of its numeric emission limits, shows that it is not diligently enforcing the decrees. *See Sierra Club v. City and Cnty. of Honolulu*, No. 04-00463, 2008 WL 1968317, at *8 (D. Haw. May 7, 2008) (unpublished) (no diligent prosecution of ten-year-old consent decree where government never sought court enforcement).

*Fourth*, and relatedly, courts have found consent decrees to be non-diligent when the penalty imposed by the regulator is insufficient to deter violations and or does not exceed the economic benefit of non-compliance. *See Laidlaw*, 528 U.S. at 175. Suncor's continued violations indicate that it has not been deterred from future violations.

## B.    The district court erred in holding that the administrative actions qualified as diligent prosecution

The District Court improperly held that the government's administrative enforcement orders and violation notices were sufficiently "diligent." None of the evidence cited by the District Court rebuts GreenLatinos' allegations of diligence. Additionally, the District Court applied the wrong standard when it applied a presumption of diligence to the administrative actions, requiring GreenLatinos to overcome this presumption.

### 1.    The evidence cited by the District Court does not support its finding of diligence

None of the evidence of administrative enforcement actions cited by the District Court supports its finding of diligent prosecution. App. Vol. X at 2312.

*First*, the District Court's reliance on EPA's Notice of Violation and Colorado's 2025 Compliance Advisory was erroneous because neither qualify as even administrative enforcement. Under both federal and Colorado law, violation notices are insufficient to initiate administrative enforcement; they

are preliminary actions. 42 U.S.C. § 7413(a)(1); C.R.S. § 25-7-115(3)(a); *see also*

*Naturaland Trust*, 41 F.4th at 348-50. Moreover, the 2025 Compliance

Advisory was filed five months after GreenLatinos' complaint and diligent

prosecution is judged at the time of complaint filing. App. Vol. IX at 1871

(Compliance Advisory filed January 9, 2025).

     *Second*, the District Court cites "ongoing monitoring and oversight of

alleged violations" required under the Compliance Orders, App. Vol. X at

2312 (citing App. Vol. VIII at 1711*; id*. at 1646-47), but neither of the order

provisions cited by the court concerns GreenLatinos' claims, nor do they

represent enforcement of consent decree requirements. One establishes a

monitoring program for hydrogen cyanide emissions, but neither

GreenLatinos' claims nor the decrees address hydrogen cyanide emissions. *See*

App. Vol. VIII at 1646-47. The other order provision asserts a violation of an

existing monitoring requirement—it does not establish an additional

monitoring requirement—and that violation is not connected to a consent

decree requirement. App. Vol. VIII at 1711 (list of violated standards does not

include decree requirements). Therefore, none of the "ongoing monitoring and

oversight" provisions cited by the District Court can support its finding of

diligent prosecution.

*Third*, the District Court cites the imposition of stipulated and civil penalties in the Compliance Orders, App. Vol. X at 2312 (citing App. Vol. VIII at 1720-22; *id.* at 1640-42), but the Court does not address the deterrent effect of those penalties. Imposition of civil penalties can support diligent prosecution if the penalties are adequate to deter further violations and remove the economic benefit of non-compliance. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.,* 890 F. Supp. 470, 492 (D.S.C. 1995). Here, the penalties imposed were demonstrably *not* sufficient to achieve deterrence. In fact, the 2024 Compliance Order imposed stipulated penalties for violations of essentially the same consent decree requirements as the 2020 Compliance Order. App. Vol. VIII at 1641 (2020 Order); *id.* at 1721 (2024 Order). Under the decrees, APCD and EPA have discretion to pursue full civil penalties instead of stipulated penalties, App. Vol. VI at 1210, ¶ 260; App. Vol. VII at 1531-32, ¶ 324, but they have chosen not to do so.[17]

*Fourth*, the District Court found that "virtually all of Defendant's conduct that Plaintiffs challenge is covered under the ongoing compliance

---

[17] In fact, the age of the decrees undermines the effectiveness of the stipulated penalty provisions. The stipulated penalty amounts have not changed, but since the decrees were entered, the maximum civil penalties for Clean Air Act violations have been increased approximately 400% to account for inflation. *Compare* 40 C.F.R. § 19.4 tbls. 1 & 2 (42 U.S.C. § 7413(b)).

orders, compliance advisories, and violation notice, and during the same period," App. Vol. X at 2312-13, but the administrative materials do not support that conclusion.[18] GreenLatinos have alleged violations for the period from July 2019 through dismissal of the amended complaint in May 2025. The last violation that an agency has actually enforced occurred in June 2021—over four years ago. *See* App. Vol. X at 2312 (citing App. Vol. VIII at 1656). So, most of the alleged violations have not been administratively enforced, let alone enforced in court. The years of delays in between violations and actual enforcement further undermine diligence. *Contrast S. River*, 69 F.4th at 826-27 (diligence shown because government imposed penalties "*each year*").

Viewing the factual allegations in the light most favorable to GreenLatinos, the evidence cited by the District Court does not support a finding of diligence or overcome the facts cited by GreenLatinos showing a lack of diligence. *See Jones*, 224 F.3d at 522-23 (en banc) (reversing district court and finding plaintiff had adequately alleged facts, taken as true, indicating lack of diligence); *Ortiz Osorio v. Municipality of Loiza*, 39 F. Supp. 3d 159, 163 (D.P.R. 2014) ("Taking the plaintiffs' well-pleaded allegations as true,

---

[18] Also, as explained in Section II.B, most of GreenLatinos' claims allege standards that are not even contemplated under the decrees and therefore have never been prosecuted in court.

there is insufficient evidence for the court to find diligent prosecution by the EPA.").

### 2. The District Court applied the wrong standard to GreenLatinos' claims on the motion to dismiss

The District Court erred by applying a presumption of diligence to Colorado and EPA's administrative enforcement actions and requiring GreenLatinos to overcome the presumption on a motion to dismiss. App. Vol. X at 2310.

*First*, requiring GreenLatinos to overcome a heavy presumption of diligence is inconsistent with the motion to dismiss standard. To survive the motion, GreenLatinos was only required to allege adequate facts, taken as true and viewed in the light most favorable to GreenLatinos, to demonstrate a lack of diligence. *Jones*, 224 F.3d at 522-23. The presumption applied by the District Court is inconsistent with that.

*Second*, none of the cases relied upon by the District Court, App. Vol. X at 2310, support a presumption of diligence for administrative enforcement of decades-old decrees. Two cases involved consent decrees entered while the citizen suit was pending, while the third involved a consent decree entered two days before the citizen suit was filed. *See Karr*, 475 F.3d at 1194 (decree entered while citizen suit was pending); *Conn. Fund for Env't v. Contract Plating Co.*, 631 F. Supp. 1291, 1293 (D. Conn. 1986) (same); *Laidlaw*, 890 F. Supp. at 479

56

(decree entered two days before citizen suit was filed). Therefore, all three cases presumed the diligence of the action taken in court, not later administrative actions.

*Third*, the cases applying a presumption were based on concerns about citizen suits interfering with agencies' ability to negotiate detailed resolutions to violations, which do not apply here. *See, e.g., Karr*, 475 F.3d at 1198; *see also Two Elk,* 646 F.3d at 1280 (Lucero, J, concurring) ("When courts have held a suit to be precluded by settlement or consent decree, the preclusive orders have contained 'substantive provisions that on their face [were] directly designed to address' serious violations or resulted in 'more [compliance] than [p]laintiffs sought to achieve on their own.'" (citations omitted)). For example, in one case, the Seventh Circuit justified applying a presumption because "courts are not in the business of designing, constructing or maintaining sewage treatment systems." *Friends*, 382 F.3d at 760; *see also S. River*, 69 F.4th at 816 (detailed plan to upgrade municipal sewer system); *Piney Run,* 523 F.3d at 459-60 (same).

Here, no such rationale applies. The decrees are not detailed, individualized plans for bringing the refinery into compliance with all of the relevant standards. Instead, as explained, they address a discrete number of issues, and, to the extent that any detailed remedial plan existed, it does not

anymore; the last deadline in either decree passed in 2012, *see, e.g.,* App. Vol.
VII at 1387, ¶ 55—more than a decade ago. *See Friends*, 382 F.3d at 752
(consent decrees cannot bar violations occurring after all work completed).
Further, no reasonable argument could be made that GreenLatinos' suit filed
twenty-years after the consent decrees makes it less likely that a polluter would
be willing to settle with an agency.

## CONCLUSION

Adopting the District Court's reasoning here would create a new
exclusion from citizen suits for any facility with a consent decree. Such a
sweeping result is absurd and goes against the text and the purpose of the
citizen suit provision, allowing regulators to "indefinitely continue an
enforcement action" and would "eviscerate the timely commencement
requirement" for an enforcement action to bar a citizen suit. *Friends*, 382 F.3d
at 753 n.5.

For these reasons, this Court should reverse the District Court's
judgment and remand the case to the District Court with direction to deny the
motion to dismiss.

DATED: November 4, 2025             Respectfully submitted,

                                    /s/Ian Coghill

                                    Ian Coghill
                                    Rachael Jaffe

58

EARTHJUSTICE
1125 17th Street
Suite 1010
Denver, CO 80202
303-996-4620
303-996-9613
icoghill@earthjustice.org
rjaffe@earthjustice.org

*Counsel for Plaintiff-Appellants*
*GreenLatinos, 350 Colorado, and Sierra*
*Club*

## ORAL ARGUMENT STATEMENT

Appellant respectfully requests oral argument. This case presents a matter of first impression in the Tenth Circuit regarding the scope of the diligent prosecution bar to the Clean Air Act citizen suit provision, 42 U.S.C. § 7604(b)(1)(B), and specifically application of the exception's in-court requirement to government consent decrees entered years before the citizen suit was filed. Appellant believes this Court's resolution of the case would be aided by oral argument.

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,964 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface and typestyle requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in Calisto MT 14-point font.

DATED: November 4, 2025      <u>/s/ Ian Coghill</u>

Ian Coghill
Rachael Jaffe
EARTHJUSTICE
1125 17th Street
Suite 1010
Denver, CO 80202
303-996-4620
303-996-9613
icoghill@earthjustice.org
rjaffe@earthjustice.org

*Counsel for Plaintiff-Appellants*
*GreenLatinos, 350 Colorado, and Sierra*
*Club*

## CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the appellate CM/ECF system on November 4, 2025. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

DATED: November 4, 2025

/s/ Ian Coghill

Ian Coghill
Rachael Jaffe
EARTHJUSTICE
1125 17th Street
Suite 1010
Denver, CO 80202
303-996-4620
303-996-9613
icoghill@earthjustice.org
rjaffe@earthjustice.org

*Counsel for Plaintiff-Appellants GreenLatinos, 350 Colorado, and Sierra Club*

# ATTACHMENT 1

**Order Granting Motion to Dismiss**

May 23, 2025

*In the Matter Of*

GreenLatinos, 350 Colorado, and Sierra Club

v.

Suncor Energy (U.S.A.) Inc.

USDC CO 1:24-cv-02164-DDD-SBP

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Daniel D. Domenico**

Civil Action No. 1:24-cv-02164-DDD-SBP

GREENLATINOS, 350 COLORADO, and
SIERRA CLUB,

   Plaintiffs,

v.

SUNCOR ENERGY (U.S.A.) INC.,

   Defendant.

---

## ORDER GRANTING MOTION TO DISMISS

---

Plaintiffs GreenLatinos, 350 Colorado, and Sierra Club are nonprofit organizations whose core priorities include environmental conservation, clean air and transportation, and wildlife protection. Dkt. 8 at 6–8. They bring this suit on behalf of their individual members against Defendant Suncor Energy (U.S.A.), Inc. for alleged violations of the Clean Air Act. Defendant has moved to dismiss under Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6). *See* Dkt. 27. Because Defendant is correct that the case is barred under the Act, the motion is granted.

## BACKGROUND

Plaintiffs' Amended Complaint alleges Defendant is one of the largest polluters in Colorado. Dkt. 8 at 5. Plaintiffs claim Defendant's Suncor Refinery in Commerce City "consistently and continuously violates the air pollution limits imposed by [state and federal] regulations," affecting the surrounding environment and the health of its residents. *Id.* at 5, 8. The harms created by these pollutants, according to Plaintiffs, include some of the highest rates of asthma, cardiovascular disease, and

diabetes. *Id.* at 13. Ailments noted by members are headaches, stomach aches, allergies, breathing issues and mental health impacts. *Id.* at 8. Members also reported that they "alter their recreation due to pollution from Suncor," including "spending less time outside in gardens or neighborhood parks with their children and changing their running and walking routes." *Id.* According to the EPA's recent analysis of the area around the refinery, "69,570 residents live within a five-kilometer radius, with the nearest residential home less than half a mile away." *Id.* at 14. These residents make up the north Denver neighborhoods and Elyria, Swansea, Globeville, and Commerce City in Adams County. *Id.* at 13.

The Amended Complaint also contains a number of allegations regarding the refinery's specific emissions, how each constitutes violations of the Act, and the EPA's and Colorado's alleged lack of diligent prosecution of consent decrees with Defendant:

> 2. Plaintiffs have documented over 9,000 days of Suncor's violation of Clean Air Act requirements subject to this Complaint.
>
> …
>
> 6. Suncor has violated limits on the hydrogen sulfide ("H2S") content of fuel gas burned by forty separate boilers, heaters, flares, and other units at the refinery. These limits help control release of H2S, sulfur dioxide ("SO2"), and particulate matter ("PM").
>
> 7. Suncor has violated limits on the "opacity" of emissions from processing units that break down crude oil and extract sulfur from process gases. These limits help control releases of particulate matter and hazardous air pollutants.
>
> 8. Suncor has violated limits on carbon monoxide ("CO") emissions at certain boilers and crude processing units. In addition to CO, these limits also help control releases of harmful hazardous air pollutants like benzene and formaldehyde.
>
> 9. Suncor has violated limits on emissions of SO2 from a processing unit that extracts sulfur from process gases. These limits also help control releases of particulate matter and other sulfurous hazardous air pollutants.

10. Suncor has violated operational requirements for flares. These requirements are meant to control releases of many hazardous air pollutants by ensuring that flares are efficiently burning and breaking down those pollutants. These requirements also help control emissions of PM, nitrogen oxides ("NOx"), and CO.

11. Suncor has violated limits on emissions of NOx from a process heater that has been violating the requirement continuously since 2006.

…

50. In 2020 alone, the refinery emitted approximately 25 tons of hazardous air pollutants, 500 tons of CO, 650 tons of NOx, 125 tons of PM, 450 tons of volatile organic compounds ("VOCs"), and 230 tons of SO2.1.

…

79. Suncor files various periodic reports with CDPHE and/or EPA in accordance with regulatory or permit reporting requirements. These reports identify events where units at Suncor emitted pollutants that exceeded a numeric regulatory limit or otherwise deviated from permit requirements.

…

112. The Suncor Refinery emits over 25 tons of hazardous air pollutants on average every year.

…

115. The Suncor Refinery emits multiple categories of hazardous air pollutants, including (1) organic hazardous air pollutants, (2) metallic hazardous air pollutants, and (3) total reduced sulfur compound hazardous air pollutants.

…

192. [The MACT CC] establishes two operational limits that the Suncor Refinery's flares have violated: (1) flare minimum combustion zone net heating value; and (2) flare smoke visibility limits.

…

203. In addition to regulatory requirements, the Suncor Refinery is also subject to additional emissions standards and limitations imposed in two consent decrees entered into between EPA and previous owners of the West Plant and East Plant.

…

205. On April 30, 2002, EPA entered into a consent decree with Conoco Inc., the prior owner of the West Plant—No. H-01-4430 ("West Plant Consent Decree"). The West Plant Consent Decree imposes various requirements on the West Plant, three of which are relevant to this action.

…

208. The Consent Decree provision has been adopted into Suncor's Title V Permit.

…

215. On November 23, 2005, EPA entered into a consent decree with Valero Refining Company, the prior owner of the East Plant—No. SA-05-CA-0569 ("East Plant Consent Decree").

…

218. The Consent Decree provision has been adopted into Suncor's Title V Permit.

…

254. The State of Colorado has not commenced an action in court to enforce the violations alleged in this Complaint.

255. [Colorado] has taken limited enforcement action against Suncor for the alleged violations. Specifically, [Colorado] has issued three administrative compliance advisories and issued an administrative order settling certain violations with Suncor.

256. [Colorado]'s enforcement actions have not stopped Suncor's violations.

257. Neither the compliance advisories nor the administrative settlement order impact Plaintiffs' ability to enforce the violations alleged in this Complaint.

258. On July 2, 2024, EPA and [Colorado] issued a Notice of Violation to Suncor that includes some of the violations alleged in this Complaint.

259. On information and belief, as of the filing of this Complaint, EPA has not commenced an action in court to enforce the violations in the Notice of Violation.

260. Therefore, as of the filing of this Complaint, neither Colorado nor EPA has commenced or are diligently prosecuting an action in court to enforce the violations alleged in this Complaint.

…

269. Suncor has reported events where the three-hour rolling H2S concentration of fuel gas burned by its flares and fuel gas combustion devices exceeded 162 ppmv.

…

273. Suncor has reported events where the six-minute average opacity of emissions from its FCCUs exceeded 30%.

…

275. Suncor has reported events where the six-minute average opacity of emissions from its FCCUs exceeded 30% during the activities identified in CO Reg. 1.

…

277. Suncor has reported events where the six-minute average opacity of emissions from its FCCUs exceeded 20%.

…

279. Suncor has reported events where the three-hour rolling average opacity of emissions from its FCCUs exceeded 20%.

…

283. Suncor has reported events where the hourly concentration of CO in the emissions from its FCCUs exceeded 500 ppmv.

…

285. Suncor has reported events where the twenty-four-hour rolling average emissions of CO from boilers B-6 and B-8 exceeded 0.06 pounds per MMBtu.

…

289. Suncor has reported events where the SO2 concentration of emissions from the West Plant SRU incinerator (H-25) exceeded 250 ppmv over a twelve-hour period.

…

291. Suncor has reported events where the West Plant SRU incinerator (H-25) emitted more than 15.68 pounds of SO2 in an hour.

…

296. Suncor has reported events where the minimum combustion zone net heating value of its flares over a fifteen-minute period fell below 270 BTU/scf.

...

298. Suncor has reported events where emissions from its flares were visible for more than five minutes in a two-hour period.

## DISCUSSION

Defendant argues Plaintiffs lack standing because the Amended Complaint fails to allege facts that Plaintiffs' members have suffered an "injury fairly traceable to emissions from alleged violations of emission limits from the Refinery." Dkt. 27 at 8. Defendant also contends that Plaintiffs' claims are "barred by the Act's diligent-prosecution bar, which prohibits a would-be plaintiff from asserting claims that are being actively prosecuted by EPA or a state," *Id.* at 9. As to Plaintiffs' claim Twenty-Five in the Amended Complaint—violations of West Plant Consent Decree three-hour NOx emission limit—Defendant argues it fails to state a viable claim because the emission limit at that plant was not established until after the time period alleged by Plaintiffs and the claim was not brought within five years from when the claim first accrued. *Id.* at 26–27.

## I.    Standing

"Article III of the Constitution confines the jurisdiction of federal courts to 'Cases' and 'Controversies.'" *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 378 (2024). These constitutional limits and the corresponding doctrine of standing that gives shape to them imply that "[f]ederal courts do not possess a roving commission to publicly opine on every legal question." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Under this doctrine, a plaintiff must show he has actually suffered a concrete injury in order "to get in the federal courthouse door and obtain a judicial determination of what the governing law is;" speculative and theoretical injuries are not enough. *All. for Hippocratic*

*Med.*, 602 U.S. at 379 ("Nor do federal courts operate as a general forum for citizens to press general complaints about the way in which government goes about its business." (quotations omitted)). In other words, "[a]s Justice Scalia memorably said, Article III requires a plaintiff to first answer a basic question: 'What's it to you?'" *Id.* (quoting A. Scalia, The Doctrine of Standing as an Essential Element of the Separation of Powers, 17 Suffolk U.L. Rev. 881, 882 (1983)); *see also Raines v. Byrd*, 521 U.S. 811, 818 (1997) ("No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." (quotations omitted)).

In order to make this preliminary showing and meet the "irreducible constitutional minimum of standing," a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robbins*, 578 U.S. 330, 338 (2016) (quotations omitted). The "plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements." *Id.* "Where, as here, a case is at the pleading stage, the plaintiff must clearly allege facts demonstrating each element." *Id.* (cleaned up).

The first factor, whether a plaintiff has suffered an injury in fact, turns on whether he has alleged "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (cleaned up). "As a general rule . . . environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *S. Utah Wilderness All. v. Palma*, 707 F.3d 1143, 1155 (10th Cir. 2013)

(quotations omitted). An organization has standing "when its members would have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires individual members' participation in the lawsuit." *Friends of the Earth v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).

The second factor, whether the injury is fairly traceable to the defendant's challenged action, turns on whether the plaintiff has shown a "substantial likelihood that the defendant's conduct caused the plaintiff's injury in fact." *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1156 (10th Cir. 2005). A plaintiff "bear[s] the burden of pleading and proving concrete facts showing that the defendant's actual action has caused the substantial risk of harm." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013).

As to the third factor, redressability, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (cleaned up). "A showing that the relief requested *might* redress the plaintiff's injuries is generally insufficient to satisfy the redressability requirement." *WildEarth Guardians v. Pub. Serv. Co. of Colo.*, 690 F.3d 1174, 1182 (10th Cir. 2012).

### A.    Legal Standards

The Tenth Circuit has recognized standing where plaintiffs suffered "adverse health effects from elevated air pollution and reduced participation in outdoor recreational activities due to [a plaintiff's] concerns about fine particulate matter pollution." *Utah Physicians for a Healthy Env't v. Diesel Power Gear, LLC,* 21 F.4th 1229, 1241 (10th Cir. 2021) (cleaned up). When a plaintiff alleges that pollution from an industrial plant that allegedly compromises air quality, diminishes visibility of nearby parks and wilderness areas, and exposes residents to increased

health risks, he need only allege a "close geographical connection" to the polluter to show the injury is fairly traceable. *Id.* at 1245 (citing *Sierra Club v. EPA*, 964 F.3d 882, 887–89 (10th Cir. 2020) and *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). This is true even where other sources may contribute to the pollution causing harm. *See Sierra Club*, 964 F.3d at 889; *see also Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 161 (4th Cir. 2000) ("Rather than pinpointing the origins of particular molecules, a plaintiff must merely show that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged in the specific geographic area of concern.").

### B.   Application

Taking as true all the well-pleaded allegations in the Amended Complaint and supporting documents, Plaintiffs have alleged sufficient facts to satisfy the traceability requirement of standing.[1] Plaintiffs' Amended Complaint (Dkt. 8) alleges that its members live within a five-kilometer radius of the refinery (¶ 54), suffer various harms related to air pollution

---

[1] Defendant does not challenge Plaintiffs' associational standing, which confers standing on an organization suing on behalf of its members when members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claims asserted nor the relief requested requires participation of individual members in the lawsuit. *See Laidlaw*, 528 U.S. at 180–81. On its face, Plaintiffs' Amended Complaint appears to satisfy these criteria. And associational standing is the current law of the land. Still, it's worth noting the inherent asymmetry in the doctrine of associational standing, as the party seeking redress for an alleged harm has not actually incurred the harm. *See FDA v. Alliance for Hippocratic Med.*, Nos. 23-235, 23-236, 602 U.S. —, slip op. at 5 (U.S. June 13, 2024) (Thomas, J., concurring)("[A]ssociational standing creates a mismatch: Although the association is the plaintiff in the suit, it has no injury to redress. The party who needs the remedy—the injured member—is not before the court.").

from it (headaches, stomach aches, allergies, breathing issues, asthma)
(¶ 21), observe its flares and routinely smell odors consistent with emit-
ted gases (¶ 22), and limit their outdoor recreational activities (garden-
ing, eating, walking, running, community events) as a result (¶¶ 22–23).
*See Utah Physicians*, 21 F.4th at 1245 (a plaintiff "has standing under
the Act … to seek a remedy from a defendant that emits the injurious
pollutant in the geographic vicinity of where the person is injured.").
Declarations attached to the Amended Complaint note the specific dis-
tance members live from the refinery, including Li Mattson and Daniel
Price—1.75 miles (Dkt. 30-3 ¶ 6; Dkt. 30-1 ¶ 8); Angela Garcia and Anna
McDevitt—2 miles (Dkt. 30-5 ¶ 7; Dkt. 30-6 ¶ 6); Harmony Cummings—
4 miles (Dkt. 30-2 ¶ 9); Aracely Navarro and Renee Chacon—5 miles
(Dkt. 30-7 ¶ 7; Dkt. 30-4 ¶6), as well as their alleged specific injuries
from the refinery's emissions: allergies, shortness of breath, burning
rubber smell, sight of haze, steam (Dkt. 30-1 ¶¶ 17, 20, 24); petroleum
and asphalt smells that cause a slight headache, irritation of the si-
nuses, throat and eyes (Dkt, 30-2 ¶¶ 13, 17); a rotten-egg and metallic
smell, arsenic and lead in soil, stomach issues, swollen eyes with black
soot (Dkt. 30-3 ¶¶ 13, 16–17); bad soil, smell of rotten eggs, auto immune
disease, severe migraines, trouble breathing, nosebleeds, throat irrita-
tion (Dkt. 30-5 ¶¶ 13, 17–18, 21); sight of flaring, distinct chemical smell,
asthma, bronchitis, pneumonia, trouble breathing, lung irritation (Dkt.
30-5 ¶¶ 8–9, 11); scratchy throat, lethargy, avoid walking/running/gar-
dening (Dkt. 30-6 ¶¶ 15, 17–18); sight of orange/gray haze, possible in-
fertility, high blood pressure, diabetes (Dkt. 30-7 ¶¶ 12, 19–20).

That the ambient air quality near the refinery does not exceed regu-
latory guidelines, as Defendant argues, is immaterial to the determina-
tion of Plaintiffs' standing. *See LaFleur v. Whitman*, 300 F.3d 256, 270
(2nd Cir. 2002) (recognizing standing "even if the ambient level of SO2
remains within [National Ambient Air Quality Standards]," explaining

that "Congress has recognized that there are potentially adverse effects from air pollution at levels below the [standards].". The same is true regarding Defendant's expert report, which states "emissions from the alleged violations have not harmed and are not harming Plaintiffs' members or anyone else." Dkt. 27 at 19. This is a merits argument masquerading as a challenge to standing, *viz.* whether Plaintiffs' allegations that they have been injured by Defendant are true. But Plaintiffs' allegations "need not prove causation with absolute scientific rigor," and need not rebut Defendant's expert findings on a motion to dismiss. *See Lujan v. National Wildlife Federation*, 497 U.S. 871, 889 (1990) ('At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we "presum[e] that general allegations embrace those specific facts that are necessary to support the claim."'). And in any event, "when plaintiffs sit squarely in the discharge zone of a polluting facility … their proximity [for purposes of establishing standing] speaks for itself." *Utah Physicians*, 21 F.4th at 1245 (citing *Env't Tex. Citizen Lobby, Inc. v. Exxon Mobil Corp.*, 968 F.3d 357, 370 (5th Cir. 2020). Plaintiffs' standing also cannot be reduced to the likelihood of health risks described in Defendant's expert report, as the injuries Plaintiffs allege also include loss of recreational and aesthetic activities that are traceable to the refinery. *See Utah Physicians*, 21 F.4th at 1245 (citing cases). Because Plaintiffs' Amended Complaint alleges sufficient facts to satisfy standing requirements, Defendant's motion to dismiss under Rule 12(b)(1) is denied. Accordingly, Plaintiffs' motion for discovery of jurisdictional facts is moot.

## I.   Diligent Prosecution

### A.   12(b)(6) Standard

"The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess

whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (citations and quotation marks omitted). A court may grant a motion to dismiss when a complaint lacks the factual content to allow a court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Santa Fe All. for Pub. Health and Safety v. City of Santa Fe, N.M.*, 993 F.3d 802, 810 (10th Cir. 2021). At this stage, the Court "must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff." *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007) (internal quotation marks omitted). "Mere 'labels and conclusions' and 'a formulaic recitation of the elements of a cause of action' will not suffice." *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). So, a court can "disregard conclusory statements and look only to whether the remaining, factual allegations plausibly suggest the defendant is liable." *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

**B.    Application**

Under the Clean Air Act, "[n]o [citizen suit] may be commenced if the [EPA] or State has commenced and is diligently prosecuting a civil action in a court of the United States or a State to require compliance with the standard, limitation, or order." 42 U.S.C. § 7604(b)(1)(B). "Congress authorized citizens' suits to allow private citizens to act when 'the Federal, State, and local agencies fail to exercise their enforcement responsibility.'" *Clean Air Council v. Sunoco, Inc.,* No. 02–1553, 2003 WL 1785879, at *3 (D. Del. Apr. 2, 2003) (quoting S. Rep. No. 92–414 at 64

(1971)). "[D]iligence on the part of the enforcement agency is presumed," *see Friends of the Earth, Inc. v. Laidlaw Env't Servs.,* 890 F.Supp. 470, 487 (D.S.C. 1995), and "the purpose underlying the 'diligent prosecution' provision" is to ensure "that a defendant not be subjected simultaneously to multiple suits, and potentially to conflicting court orders, to enforce the same statutory standards." *Conn. Fund for Env't v. Contract Plating Co.,* 631 F. Supp. 1291, 1293 (D. Conn. 1986). "The plaintiff in a citizens suit bears the burden of proving the state agency's prosecution is not diligent, and the agency must be given great deference to proceed in the manner it considers is in the best interest of all parties involved." *Karr,* 475 F.3d at 1198 (cleaned up). Plaintiffs have not met their burden.

Over twenty years before Plaintiffs filed the present suit against Defendant for alleged violations of the Act, the EPA, Colorado, and Defendant's predecessor entered into two federal court-ordered consent decrees that resolved civil actions alleging either identical or substantially similar violations of the Act's emissions standards and limitations as alleged in Plaintiffs' Amended Complaint. *Cf.* Dkt. 27-5 at 6–90 and 27-6 at 10–174 *with* Dkt. 8 at 55–77. The consent decrees required compliance with the Act's emissions standards, imposed injunctive relief at Defendant's refinery, and subjected Defendant to stipulated penalties for future violations. *See* Dkt. 27-5 at 5–67; 27-6 at 10–174. In March 2020 and February 2024, Defendant and Colorado entered in two "Compliance Orders on Consent" that imposed additional injunctive relief and stipulated and administrative penalties for Defendant's alleged failure to comply with its earlier consent decrees and compliance advisories. *See* Dkt. 27-7; Dkt. 27-8. And in July 2024, the EPA and Colorado issued to Defendant a joint Notice of Violation alleging violations of various requirements of the consent decrees and other Title V and federal regulations. *See* Dkt. 27-9.

Taken together, the consent decrees, compliance orders, compliance advisories, and notice of violation serve as ongoing enforcement actions by the EPA and Colorado against Defendant for alleged violations of the Act. As a result, Plaintiffs' citizen suit, which consists of identical or substantially similar allegations, is barred by statute. *See Karr*, 475 F.3d at 1197 ("A federal court ought not to allow a citizens' suit to proceed merely because a prior pending state suit has not alleged as many separate violations of the Act as has the citizens' suit and therefore seeks to impose a less substantial civil penalty on the defendant.") (citing *Conn. Fund*, 631 F.Supp. at 1293); *see also Dodge v. Mirant Mid-Atlantic, LLC*, 732 F. Supp. 2d 578, 585 (D. Md. 2010) (ruling an earlier consent decree barred an Act citizen suit even though it resolved violations of a different but related standard).

Plaintiffs argue that the EPA and Colorado did not have an active enforcement case *in court* at the time it filed its suit and thus are not diligently prosecuting a civil action under 42 U.S.C. § 7604(b)(1)(B). *See* Dkt. 30 at 21 (citing *S. River Watershed All., Inc. v. Dekalb Cnty., Ga.*, 69 F.4th 809, 823 (11th Cir. 2023)). They also assert that consent decrees are final judgments that do not satisfy the "in court" requirement, and that "[a]dministrative enforcement of a pre-suit consent decree cannot qualify as diligent prosecution." *See* Dkt. 30 at 23–24 (citing *Sierra Club v. City & Cnty. of Honolulu*, No. 04-00463, 2008 WL 1968317, at *5 (D. Haw. May 7, 2008)). I disagree.

As the Tenth Circuit has noted:

> [W]hen the EPA chooses to enforce [a federal statute] through a consent decree, failure to defer to its judgment can undermine agency strategy. If a defendant is exposed to a citizen suit whenever the EPA grants it a concession, defendants will have little incentive to negotiate consent decrees. The Supreme Court has recognized the importance of deference to the EPA's bargains.

*Karr*, 475 F.3d at 1197. An administrative action enforcing a court-ordered consent decree—as is the case here with the EPA's and Colorado's recent Compliance Orders, Compliance Advisories, and Notice of Violation—is sufficient to trigger the diligent prosecution bar. *See Grp. Against Smog and Pollution, Inc. v. Shenango, Inc.*, 810 F.3d 116, 128 (3rd Cir. 2016) ("the diligent prosecution bar will prohibit citizen suits during the actual litigation [commenced by an agency] as well as after the litigation has been terminated by a final judgment, consent decree, or consent order and agreement."). The consent decrees and the enforcement mechanisms against Defendant that followed them resolve identical or substantially similar alleged emission violations in Plaintiffs' Amended Complaint, *see supra* at 13, have resulted in stipulated and administrative penalties, *see* 27-8 at 65–67; 27-7 at 72–74, and provide ongoing monitoring and oversight of the alleged violations, *see* 27-8 at 56; 27-7 at 78-80. The 2020 Compliance Order brought renewed enforcement and imposed penalties against Defendant for alleged violations between July 2017 and December 2019; the 2023 Compliance Advisory for alleged violations between July 2021 and June 2022 (excluding the allegation related to H-2101); the 2024 Compliance Order for alleged violations between July 2019 and June 2021; the 2024 Notice of Violation (which incorporates the 2023 Compliance Advisory) for alleged violations between January 2020 and November 2023; and the 2025 Compliance Advisory for alleged violations between July 2022 and June 2023 (excluding the allegation related to H-2101). The violations alleged in the Amended Complaint date from July 2019 to May 2025 (other than the allegation related to H-2101), so virtually all of Defendant's conduct that Plaintiffs challenge is covered under the ongoing compliance orders, compliance advisories, and violation notice, and during the same period

of time.[2] Permitting Plaintiffs to prosecute a citizen suit aimed at curbing the same alleged violations would undercut the EPA's and Colorado's enforcement efforts, and is contrary to the Act's own restriction on citizen suits.

That the consent decrees at issue here are of a particular vintage does not render them irrelevant, as Plaintiffs argue. The use of consent decrees to enforce certain laws for long periods of time is instead a feature of their design—they allow states and the EPA to take action against a party in need of protracted oversight and streamlined future enforcement without the need to initiate a new lawsuit each time. When properly entered into and administered effectively, consent decrees can make diligent prosecution easier, less expensive, and more efficient.[3] Had the EPA and Colorado made no effort to enforce the consent decrees prior to Plaintiffs' lawsuit, the recourse sought here may have been appropriate. But because the consent decrees have been used actively by the state and federal governments to ensure Defendant's compliance with the Act, Plaintiffs' citizen suit is barred and must be dismissed.

---

[2] *See also* Dkt. 27-4.

[3] There are, to be sure, legitimate reasons to be concerned about the potential abuse of consent decrees. *See e.g.*, Janette L. Ferguson & Laura Granier, *Sue and Settle: Citizen Suit Settlements and Environmental Law*, 30 Nat. Resources & Env't 23, 23–24 (2015); Henry N. Butler & Nathaniel J. Harris, *Sue, Settle, and Shut Out the States: Destroying the Environmental Benefits of Cooperative Federalism*, 37 Harv. J. L. & Pub. Pol. 579 (2014); Stephen M. Johnson, *Sue and Settle: Demonizing the Environmental Citizen Suit*, 37 Seattle U. L. Rev. 891, 892–895 (2014); U.S. Department of the Interior, Order No. 3368, Promoting Transparency and Accountability in Consent Decrees and Settlement Agreements (2018). Yet they are a longstanding method of enforcing environmental laws like the Clean Air Act.

## CONCLUSION

Accordingly, it is **ORDERED** that:

Defendant's Motion to Dismiss, **Dkt. 27**, is **GRANTED** and

Plaintiffs' Motion for Discovery of Jurisdictional Facts, **Dkt. 31**, is **MOOT**.

DATED: May 23, 2025              BY THE COURT:

Daniel D. Domenico
United States District Judge

# ATTACHMENT 2

**Final Judgment**

May 23, 2025

*In the Matter Of*

GreenLatinos, 350 Colorado, and Sierra Club

v.

Suncor Energy (U.S.A.) Inc.

USDC CO 1:24-cv-02164-DDD-SBP

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:24-cv-02164-DDD-SBP

GREENLATINOS, 350 COLORADO, and
SIERRA CLUB,

     Plaintiffs,

v.

SUNCOR ENERGY (U.S.A.) INC.,

     Defendant.

---

## FINAL JUDGMENT

---

In accordance with the orders filed during the pendency of this case, and pursuant to Fed. R. Civ. P. 58(a), the following Final Judgment is entered.

Pursuant to and in accordance with Fed. R. Civ. P. 58(a) and the Order Granting Motion to Dismiss, filed May 23, 2025, by the Honorable Daniel D. Domenico, United States District Judge, and incorporated herein by reference as if fully set forth, it is hereby

ORDERED that judgment is hereby entered in favor of Defendant, Suncor Energy (U.S.A.), Inc., and against Plaintiffs, GreenLatinos, 350 Colorado, and Sierra Club, on Defendant's Motion to Dismiss. It is further

ORDERED that Plaintiffs' complaint and action are dismissed.

1

DATED at Denver, Colorado this <u>23rd</u> day of May, 2025.

FOR THE COURT:

JEFFREY P. COLWELL, CLERK


*s/ Robert R. Keech*
Robert R. Keech,
Deputy Clerk

2

# ATTACHMENT 3

**42 U.S.C. § 7604**

Citizen Suits

**42 USC 7604: Citizen suits**
Text contains those laws in effect on September 2, 2025

**From Title 42-THE PUBLIC HEALTH AND WELFARE**
CHAPTER 85-AIR POLLUTION PREVENTION AND CONTROL
SUBCHAPTER III-GENERAL PROVISIONS
**Jump To:**
**Source Credit**
**Miscellaneous**
**References In Text**
**Codification**
**Prior Provisions**
**Amendments**
**Effective Date**
**Termination Date**

## §7604. Citizen suits

**(a) Authority to bring civil action; jurisdiction**

Except as provided in subsection (b), any person may commence a civil action on his own behalf-

(1) against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the Eleventh Amendment to the Constitution) who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of (A) an emission standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation,

(2) against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator, or

(3) against any person who proposes to construct or constructs any new or modified major emitting facility without a permit required under part C of subchapter I (relating to significant deterioration of air quality) or part D of subchapter I (relating to nonattainment) or who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of any condition of such permit.

The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce such an emission standard or limitation, or such an order, or to order the Administrator to perform such act or duty, as the case may be, and to apply any appropriate civil penalties (except for actions under paragraph (2)). The district courts of the United States shall have jurisdiction to compel (consistent with paragraph (2) of this subsection) agency action unreasonably delayed, except that an action to compel agency action referred to in section 7607(b) of this title which is unreasonably delayed may only be filed in a United States District Court within the circuit in which such action would be reviewable under section 7607(b) of this title. In any such action for unreasonable delay, notice to the entities referred to in subsection (b)(1)(A) shall be provided 180 days before commencing such action.

**(b) Notice**

No action may be commenced-

(1) under subsection (a)(1)-

(A) prior to 60 days after the plaintiff has given notice of the violation (i) to the Administrator, (ii) to the State in which the violation occurs, and (iii) to any alleged violator of the standard, limitation, or order, or

(B) if the Administrator or State has commenced and is diligently prosecuting a civil action in a court of the United States or a State to require compliance with the standard, limitation, or order, but in any such action in a court of the United States any person may intervene as a matter of right.[1]

(2) under subsection (a)(2) prior to 60 days after the plaintiff has given notice of such action to the Administrator,

except that such action may be brought immediately after such notification in the case of an action under this section respecting a violation of section 7412(i)(3)(A) or (f)(4) of this title or an order issued by the Administrator pursuant to section 7413(a) of this title. Notice under this subsection shall be given in such manner as the Administrator shall prescribe by regulation.

**(c) Venue; intervention by Administrator; service of complaint; consent judgment**

(1) Any action respecting a violation by a stationary source of an emission standard or limitation or an order respecting such standard or limitation may be brought only in the judicial district in which such source is located.

(2) In any action under this section, the Administrator, if not a party, may intervene as a matter of right at any time in the proceeding. A judgment in an action under this section to which the United States is not a party shall not, however,

have any binding effect upon the United States.

(3) Whenever any action is brought under this section the plaintiff shall serve a copy of the complaint on the Attorney General of the United States and on the Administrator. No consent judgment shall be entered in an action brought under this section in which the United States is not a party prior to 45 days following the receipt of a copy of the proposed consent judgment by the Attorney General and the Administrator during which time the Government may submit its comments on the proposed consent judgment to the court and parties or may intervene as a matter of right.

**(d) Award of costs; security**

The court, in issuing any final order in any action brought pursuant to subsection (a) of this section, may award costs of litigation (including reasonable attorney and expert witness fees) to any party, whenever the court determines such award is appropriate. The court may, if a temporary restraining order or preliminary injunction is sought, require the filing of a bond or equivalent security in accordance with the Federal Rules of Civil Procedure.

**(e) Nonrestriction of other rights**

Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any emission standard or limitation or to seek any other relief (including relief against the Administrator or a State agency). Nothing in this section or in any other law of the United States shall be construed to prohibit, exclude, or restrict any State, local, or interstate authority from-

(1) bringing any enforcement action or obtaining any judicial remedy or sanction in any State or local court, or

(2) bringing any administrative enforcement action or obtaining any administrative remedy or sanction in any State or local administrative agency, department or instrumentality,

against the United States, any department, agency, or instrumentality thereof, or any officer, agent, or employee thereof under State or local law respecting control and abatement of air pollution. For provisions requiring compliance by the United States, departments, agencies, instrumentalities, officers, agents, and employees in the same manner as nongovernmental entities, see section 7418 of this title.

**(f) "Emission standard or limitation under this chapter" defined**

For purposes of this section, the term "emission standard or limitation under this chapter" means-

(1) a schedule or timetable of compliance, emission limitation, standard of performance or emission standard,

(2) a control or prohibition respecting a motor vehicle fuel or fuel additive, or [2]

(3) any condition or requirement of a permit under part C of subchapter I (relating to significant deterioration of air quality) or part D of subchapter I (relating to nonattainment),[3] section 7419 of this title (relating to primary nonferrous smelter orders), any condition or requirement under an applicable implementation plan relating to transportation control measures, air quality maintenance plans, vehicle inspection and maintenance programs or vapor recovery requirements, section 7545(e) and (f) of this title (relating to fuels and fuel additives), section 7491 of this title (relating to visibility protection), any condition or requirement under subchapter VI (relating to ozone protection), or any requirement under section 7411 or 7412 of this title (without regard to whether such requirement is expressed as an emission standard or otherwise);[4] or

(4) any other standard, limitation, or schedule established under any permit issued pursuant to subchapter V or under any applicable State implementation plan approved by the Administrator, any permit term or condition, and any requirement to obtain a permit as a condition of operations.[5]

which is in effect under this chapter (including a requirement applicable by reason of section 7418 of this title) or under an applicable implementation plan.

**(g) Penalty fund**

(1) Penalties received under subsection (a) shall be deposited in a special fund in the United States Treasury for licensing and other services. Amounts in such fund are authorized to be appropriated and shall remain available until expended, for use by the Administrator to finance air compliance and enforcement activities. The Administrator shall annually report to the Congress about the sums deposited into the fund, the sources thereof, and the actual and proposed uses thereof.

(2) Notwithstanding paragraph (1) the court in any action under this subsection [6] to apply civil penalties shall have discretion to order that such civil penalties, in lieu of being deposited in the fund referred to in paragraph (1), be used in beneficial mitigation projects which are consistent with this chapter and enhance the public health or the environment. The court shall obtain the view of the Administrator in exercising such discretion and selecting any such projects. The amount of any such payment in any such action shall not exceed $100,000.

(July 14, 1955, ch. 360, title III, §304, as added Pub. L. 91–604, §12(a), Dec. 31, 1970, 84 Stat. 1706 ; amended Pub. L. 95–95, title III, §303(a)–(c), Aug. 7, 1977, 91 Stat. 771 , 772; Pub. L. 95–190, §14(a) (77), (78), Nov. 16, 1977, 91 Stat. 1404 ; Pub. L. 101–549, title III, §302(f), title VII, §707(a)–(g), Nov. 15, 1990, 104 Stat. 2574 , 2682, 2683.)

**EDITORIAL NOTES**

### References in Text

The Federal Rules of Civil Procedure, referred to in subsec. (d), are set out in the Appendix to Title 28, Judiciary and Judicial Procedure.

### Codification

Section was formerly classified to section 1857h–2 of this title.

### Prior Provisions

A prior section 304 of act July 14, 1955, was renumbered section 311 by Pub. L. 91–604 and is classified to section 7611 of this title.

### Amendments

**1990**-Subsec. (a). Pub. L. 101–549, §707(a), (f), in closing provisions, inserted before period at end ", and to apply any appropriate civil penalties (except for actions under paragraph (2))" and inserted sentences at end giving courts jurisdiction to compel agency action unreasonably delayed and requiring 180 days notice prior to commencement of action.

Subsec. (a)(1), (3). Pub. L. 101–549, §707(g), inserted "to have violated (if there is evidence that the alleged violation has been repeated) or" before "to be in violation".

Subsec. (b). Pub. L. 101–549, §302(f), substituted "section 7412(i)(3)(A) or (f)(4)" for "section 7412(c)(1) (B)" in closing provisions.

Subsec. (c)(2). Pub. L. 101–549, §707(c), amended par. (2) generally. Prior to amendment, par. (2) read as follows: "In such action under this section, the Administrator, if not a party, may intervene as a matter of right."

Subsec. (c)(3). Pub. L. 101–549, §707(d), added subsec. (c)(3).

Subsec. (f)(3). Pub. L. 101–549, §707(e), struck out "any condition or requirement of section 7413(d) of this title (relating to certain enforcement orders)" before ", section 7419 of this title", substituted "subchapter VI" for "part B of subchapter I", and substituted "; or" for period at end.

Subsec. (f)(4). Pub. L. 101–549, §707(e), which directed that par. (4) be added at end of subsec. (f), was executed by adding par. (4) after par. (3), to reflect the probable intent of Congress.

Subsec. (g). Pub. L. 101–549, §707(b), added subsec. (g).

**1977**-Subsec. (a)(3). Pub. L. 95–190, §14(a)(77), inserted "or modified" after "new".

Pub. L. 95–95, §303(a), added subsec. (a)(3).

Subsec. (e). Pub. L. 95–95, §303(c), inserted provisions which prohibited any construction of this section or any other law of the United States which would prohibit, exclude, or restrict any State, local, or interstate authority from bringing any enforcement action or obtaining any judicial remedy or sanction in any State or local court against the United States or bringing any administrative enforcement action or obtaining any administrative remedy or sanction against the United States in any State or local administrative agency, department, or instrumentality under State or local law.

Subsec. (f)(3). Pub. L. 95–190, §14(a)(78), inserted ", or" after "(relating to ozone protection)", substituted "any condition or requirement under an" for "requirements under an", and struck out "or" before "section 7491".

Pub. L. 95–95, §303(b), added par. (3).

**Statutory Notes and Related Subsidiaries**

### Effective Date of 1990 Amendment

Pub. L. 101–549, title VII, §707(g), Nov. 15, 1990, 104 Stat. 2683 , provided that: "The amendment made by this subsection [amending this section] shall take effect with respect to actions brought after the date 2 years after the enactment of the Clean Air Act Amendments of 1990 [Nov. 15, 1990]."

### Effective Date of 1977 Amendment

Amendment by Pub. L. 95–95 effective Aug. 7, 1977, except as otherwise expressly provided, see section 406(d) of Pub. L. 95–95, set out as a note under section 7401 of this title.

### Termination of Reporting Requirements

For termination, effective May 15, 2000, of reporting provisions in subsec. (g)(1) of this section, see section 3003 of Pub. L. 104–66, as amended, set out as a note under section 1113 of Title 31, Money and Finance, and the 6th item on page 165 of House Document No. 103–7.

## PENDING ACTIONS AND PROCEEDINGS

Suits, actions, and other proceedings lawfully commenced by or against the Administrator or any other officer or employee of the United States in his official capacity or in relation to the discharge of his official duties under act July 14, 1955, the Clean Air Act, as in effect immediately prior to the enactment of Pub. L. 95–95 [Aug. 7, 1977], not to abate by reason of the taking effect of Pub. L. 95–95, see section 406(a) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

## MODIFICATION OR RESCISSION OF RULES, REGULATIONS, ORDERS, DETERMINATIONS, CONTRACTS, CERTIFICATIONS, AUTHORIZATIONS, DELEGATIONS, AND OTHER ACTIONS

All rules, regulations, orders, determinations, contracts, certifications, authorizations, delegations, or other actions duly issued made, or taken by or pursuant to act July 14, 1955, the Clean Air Act, as in effect immediately prior to the date of enactment of Pub. L. 95–95 [Aug. 7, 1977] to continue in full force and effect until modified or rescinded in accordance with act July 14, 1955, as amended by Pub. L. 95–95 [this chapter], see section 406(b) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

---

[1] So in original. The period probably should be ", or".

[2] So in original. The word "or" probably should not appear.

[3] So in original.

[4] So in original. The semicolon probably should be a comma.

[5] So in original. The period probably should be a comma.

[6] So in original. Probably should be "this section".